Julia C. **BOHANNON**, Plaintiff,

v.

**CHRYSLER MOTORS CORPORA-
TION et al., Defendants.**

Civ. A., No. 4280.

United States District Court,
S. D. Mississippi, S. D.

Oct. 24, 1973.

Bobby G. O'Barr, Biloxi, Miss., for plaintiff.

Thomas D. Bourdeaux, Meridian, Miss., and Ronald G. Peresich, Biloxi, Miss., for Chrysler Motors Corp., and Chrysler Corp.

OPINION OF THE COURT

DAN M. RUSSELL, Jr., Chief Judge.

Mrs. Julia C. Bohannon, an adult resident citizen of Gulfport, Mississippi, originally filed this diversity cause of action against Chrysler Motors Corporation, chartered in Delaware with its principal place of business in Detroit, Michigan, but authorized to do business in Mississippi, and against Allstate Insurance Company, chartered in Illinois, and also qualified to do business in Mississippi. In her original complaint plaintiff charged Chrysler Motors Corporation, herein called Chrysler Motors, with negligently manufacturing her 1965 Plymouth Fury III with defective brakes, negligently failing to inspect and discover the defective brakes, and with placing on the market a vehicle in an inherently dangerous condition which could not and would not have been discovered by plaintiff upon a reasonable inspection; and that each of the charged acts of negligence was a direct and proximate cause or contributing cause of her injuries resulting from an accident.

Plaintiff alleged that on August 2, 1965, she purchased new the aforesaid Plymouth from Sevier-Folk Motor Co., Inc., Tallulah, Louisiana, for her personal use as well as for use in her employment. On October 30, 1965, the date of her accident, plaintiff and two passengers were returning to Gulfport from a

church conference in Tuscaloosa, Alabama. They left Tuscaloosa in the afternoon and were a few miles south of Tuscaloosa going south on U. S. Highway 11, a paved, two lane highway, when one James Odwin Styes of Tuscaloosa, in a vehicle owned by him and traveling in the same direction, attempted to over-take plaintiff's car, ran off the paved portion of the left lane, lost control, and skidded into the left rear of plaintiff's vehicle. Styes continued on a collision course and struck plaintiff's vehicle a second time, then passed her on the right and stopped suddenly and without warning in front of plaintiff. Plaintiff vigorously applied her brakes to avoid colliding with the rear of Styes' vehicle, and, as she did so, her braking action caused her vehicle to veer suddenly to the left, skid across the north bound lane and proceed down an embankment; that, in order to avoid a tree in her path, she again applied her brakes, the car again veered sharply and came to rest parallel and adjacent to a fence, the front of her car facing north. Alabama state troopers were called to the scene, made an investigation, trailed Styes' car from a wheel rim mark for several miles to where he abandoned it, and later arrested him on charges of drunk driving.

Styes having been found to be an uninsured motorist, plaintiff joined Allstate Insurance Company as a defendant, making a claim for the limit of her policy with respect to uninsured motorist coverage. By stipulation of the parties and an Order of this Court, Allstate has been dismissed from the action.

As a result of interrogatories addressed to Chrysler Motors, plaintiff learned that Chrysler Motors, a subsidiary of Chrysler Corporation, sold the car to Sevier-Folk Motor Co., Inc., and that Chrysler Corporation herein called Chrysler, was actually the manufacturer. With leave of the Court, plaintiff added Chrysler as a defendant and amended her complaint, charging Chrysler with negligently designing and manufacturing her vehicle with defective brakes, and charging both Chrysler defendants with negligently failing to inspect and discover the defective brakes, and with negligently placing on the market a vehicle in an inherently dangerous condition which could not and would not have been discovered by plaintiff in a reasonable inspection.[1]

The case was tried to the Court without a jury.

Numerous answers of both Chrysler defendants to plaintiff's interrogatories, correspondence between both defendants' and plaintiff's former attorneys and inter-corporate correspondence were introduced as exhibits, primarily for the purpose of showing that Chrysler, as the manufacturer of the vehicle, knew or should have known, but, for a mistake, that the action would have been brought against it before the running of the Mississippi six year statute of limitations. As stated above, the Court has previously ruled on this point in its opinion of July 3, 1973, and finds it unnecessary to consider the issue again.

As a witness on her own behalf, plaintiff testified, as alleged in her complaint, that, while employed by a federal agency in Louisiana, she, on August 2, 1965, bought new a 1965 Plymouth Fury III from a dealer, Sevier-Folk Motor Co., Inc., of Tallulah, Louisiana. She identified her invoice and a Manufacturer's Statement of Origin to a Motor Vehicle in which Chrysler certified that the vehicle was transferred to the dealer new. She identified vouchers reflecting that her employment, on a contract basis, paid her $60.00 per day, $16.00 per diem for subsistence, and 10¢ per mile travel expense by private automobile. She completed her contract in August with every intention of accepting similar contracts in the future, being temporarily

1. A year after plaintiff's amended complaint lacking a month, and after continuing discovery engaged in by both Chrysler defendants, Chrysler filed a motion to dismiss on the grounds that the statute of limitations had run as to it. In an opinion of this Court, dated July 3, 1973, the motion was denied for the reasons therein given.

delayed by the illness of her husband. Her previous employment included clerical work in accounting, and being an office manager for a lumber supply and motor company respectively. She conducted her own lumber and construction company for approximately eleven years before closing it.

Plaintiff testified that she was a conservative, defensive driver. That although not required to, she nevertheless drove her new car at conservative speeds, slowing for traffic and in anticipation of traffic signals with as little braking as possible. That, nonetheless, she began to have difficulty with her brakes which she described as a "chatter", and, when she used a "soft brake", said that there was a hesitation, or a partial revolution of the wheels before the brakes became effective. She took her car to John Gimma, the local Chrysler-Plymouth dealer in Gulfport, for a 500 mile check-up and at other times as required by the conditions of her warranty. At the first check-up she complained about the brakes and poor gas mileage. At that time she said that Gimma's service manager, Grover McGee, kidded her about not being used to a new car, in contrast to her old Oldsmobile, and said the brakes would "seat in" after a time.

On October 30, 1965, when the Plymouth had about 5000 miles registered on its speedometer, plaintiff stated that she and two friends, Reverend A. H. Lambright, a retired Congregationalist minister, and his wife, Grace Lambright, were returning to Gulfport from a Unitarian church conference in Tuscaloosa. They had reached a point on U. S. Highway 11 about 3½ miles south of Tuscaloosa, when plaintiff, driving between 45 and 50 miles an hour, saw a car, driven by whom she later learned was Styes, approaching rapidly from the rear. Styes struck plaintiff's vehicle on the left rear, plaintiff accelerated to get out of his way, and her vehicle was nonetheless struck again, more forcefully, on the left rear quarter panel. Styes dropped back momentarily, and then passed plaintiff's vehicle to her right on the shoulder of the highway, and, as he pulled over in front of plaintiff, proceeded to brake his car. Plaintiff said she then made a vigorous application of her brakes in order to avoid striking Styes from the rear. As she did, her car lurched violently to the left heading across the on-coming traffic lane of Highway 11. Plaintiff said she retained control of her car and withdrew pressure from her brakes but realized she was headed off the road down an embankment toward a tree. She again applied her brakes vigorously, the car again lurching to the left. As the car skidded sideways down the embankment, plaintiff lost her grip on the steering wheel, one hand brushing against and releasing her seat belt. As the car rocked back and forth before coming to rest parallel to a fence and headed back north toward Tuscaloosa, plaintiff was tossed violently about in the car, and remembers that she felt her bones cracking. A Mrs. Stillwood, driver of a car ahead, saw the accident in her rear view mirror, came back and took plaintiff to a nearby house, where the resident, a Mrs. Smallwood, said she had already called the Alabama Highway Patrol. Plaintiff returned to her car and waited for the officers to arrive. When Officers Wheat and Curtis arrived, she talked to them up on the highway. Wheat pointed out from debris where the Styes' car had hit plaintiff's twice, and proceeded onward. He was puzzled as to why plaintiff's car had traveled from the right or west lane of the highway abruptly across the left or north bound lane and down the embankment, a distance of 222 feet before coming to rest against a fence, with plaintiff's car headed in the reverse direction. Plaintiff admitted that she said nothing to the officers about her brakes, but said that she and the patrolmen were more interested in the conduct of the other driver, Styes, whom the officers later apprehended. On cross-examination, plaintiff denied, in order to avoid Styes when he proceeded in front of her, that she turned the car to the left. She said

that if she ever ditched a car it would be to the right and not to the left in the face of oncoming traffic. When shown a copy of the officers' official report of the accident, plaintiff was non-plused as to why the report indicated she had lost control after the second collision from Styes' car. Continuing with her testimony, plaintiff stated that Rev. Lambright drove her car up the embankment to the highway, where she drove the three of them back to Tuscaloosa. They had the right front wheel, which was bent, changed, spent the night, and returned to Gulfport on a Sunday, the day following the accident. Plaintiff, realizing that she was sore and bruised, with her neck and back hurting, was able to locate Dr. E. C. Hamilton, her doctor and neighbor, that night by telephone. He prescribed bed rest, heat and aspirin. Plaintiff's nearly six year travail of seeking medical attention and relief up to the filing of her suit, and afterwards, and the numerous medical reports are reserved for a later portion of this opinion. It is sufficient to say at this point that, although her cervical injuries have apparently responded to treatment and time, her lumbar complaints have continued and, at the time of the trial, plaintiff was a semi-invalid. Her prognosis is not good.

The only immediate witnesses to the accident, other than the drivers, were Rev. Lambright and his wife. Their depositions were offered into evidence. Both had met plaintiff at church and had known her for about twelve years. Lambright was a passenger on the front seat, his wife in the back. Both corroborated plaintiff's account of the accident. The weather was clear and the road was dry. Mrs. Lambright's observance of the accident was partially blocked when Styes hit them the second time from the rear, because clothes hanging on a rack in the rear fell over her head, but both verified that, after the second collision, when plaintiff tried to brake to avoid hitting Styes who was then in front of plaintiff's car, plaintiff's car veered suddenly off the road.

Both verified that plaintiff was a good, conservative driver; that prior to the accident she had been proceeding at about 45 to 50 miles per hour on her side of the road, and had full control of her car until they were sliding down the embankment and plaintiff's seat belt broke open. Lambright was not injured in the accident. Mrs. Lambright received a sprained foot. That night in Tuscaloosa and on the way back to Gulfport the following day plaintiff said her neck and back hurt. Both Lambrights said that, prior to the accident, plaintiff was in good health, a vivacious and intelligent woman. They have seen her numerous times in the intervening years, mostly to check on her health. Plaintiff has variously been confined to bed, in a wheelchair, on crutches, and now walks with a cane. Her reports to them is that she is in constant pain.

Following plaintiff's return to Gulfport, she had her car repaired at McCaffrey's Auto Body & Service Center. After the repairs she used the car very little but enough to know that the brakes still chattered. She determined to see a factory representative and said she called McGee at Gimma's so many times that he became angry with her. In April 1966, accompanied by Mr. Paul Kirk, a former employee, she was driving down Hewes Avenue, in Gulfport, and braked suddenly to avoid a dog. Again her car veered abruptly to the left. She proceeded immediately to Gimma's where the service manager had a mechanic road test the car with herself and Kirk as passengers. The mechanic applied a vigorous brake, and the car veered. The service manager said her brake drums were out of round, particularly the right front drum. While they waited, the two front drums were taken to Master Brake and Axle, where they were lathed and trued, and replaced on plaintiff's car by the Gimma mechanic, the transaction being handled as a repair job in warranty at no cost to plaintiff. She continued to have difficulty with the brakes and in August 1966 returned the car to McCaffrey's. There

Marvin D. Zimmerman, service manager of McCaffrey's, road tested the car. He put it into a panic stop and said the car pulled so abruptly to the left and vibrated to such an extent that he had to release the brakes. He reported to plaintiff that the car was unsafe. On her directions to fix it, he aligned the front end, crossed the tires, and eventually replaced the brake shoes on all four wheels, and honed and trued all four brake drums. He saw no evidence of previous lathing. Qualified as an expert mechanic and given the hypothetical facts of plaintiff's accident as testified to by her, it was Zimmerman's opinion that, upon plaintiff's vigorous application of her brakes, not as much pressure was exerted by the right brake as by the left, there was not as much contact of the right shoe on the drum as in the left brake, that the lack of uniform contact of the shoes to the drum indicated that the drum was out of round, and that this out-of-roundness was responsible for the right brake's failure, causing the car to veer abruptly to the left. It was his opinion that the condition had existed from the time plaintiff purchased the car, and, plaintiff, not being a mechanic, had no way of knowing what was wrong. Zimmerman acknowledged that he had previously made repairs for plaintiff on her old car, as well as the new, but that when she had previously complained about her brakes, he referred her back to the local dealer so as not to void her warranty. He acknowledged that he had given a statement to plaintiff's former attorney that the brake linings were improperly bonded to the shoes and that he had turned over to plaintiff the brake linings that he removed when he repaired her car in August 1966.

Following Zimmerman's repairs to the entire braking system, plaintiff has had no further trouble with the brakes.

Plaintiff offered four other witnesses, the medical deposition of Dr. Kendall D. Gregory, and evidence of her medical expenses.

George Culberson of Fredericksburg, Virginia, testified that in 1965 he was Associate Director of the Community Relations Service of the Department of Commerce in Washington, D.C., and was building up a field staff. He verified plaintiff's employment with that agency on a contract basis and said that she had performed creditably and would have been offered other contracts but for her accident.

Paul Kirk, a former employee of plaintiff's when she owned her own building supply company and who was a passenger of plaintiff's when she braked to avoid hitting a dog, verified that on that occasion, her car swerved to the left. He stated that he told plaintiff then to get her car fixed before she hit someone in the opposite lane. He was in the car when Gimma's mechanic road tested it and said that when the mechanic vigorously applied the brakes the car again swerved. Kirk also stated that when he worked for plaintiff and prior to her accident, she was in good health. He now sees her once or twice a week, and she complains of her back injury and limps.

Mrs. Annell Saucier, formerly a licensed practical nurse, stated that she had known plaintiff since 1963 when plaintiff was a political candidate for a state representative post; that plaintiff's health was good and that she was very agile. Since plaintiff's accident, the witness said plaintiff has at times been on crutches, is in constant pain and at times very depressed. The witness sees plaintiff more than before her accident and helps with her therapy treatment.

Charles H. Eilert, now of Gulfport, formerly of Indianapolis, Indiana, where he was director of service for Gates Motors, Inc., now Hoosier Chrysler-Plymouth, from 1952 to 1971, testified on behalf of plaintiff. As director of services for these Chrysler dealers, he said he was in charge of all repairs, the parts division and served as liason with Chrysler. He had anywhere from 85 to 100 mechanics under him. He kept ap-

prised of all Chrysler vehicles, their parts and maintenance, through monthly programs. He attended annual training sessions in Detroit. He had engaged in research at Chrysler's proving grounds. He has contributed articles to "Automotive News" on policies, procedures, management and innovations. He has designed component parts, particularly as to steering couplets. He has had experience with braking systems, saying he had worked on thousands of them. He has previously testified as an expert witness on brakes at least eight times, and on behalf of Chrysler. In answer to a hypothetical question encompassing facts such as plaintiff has advanced in this action, he stated the reason for the vehicle to swerve violently to the left was because of an out of round condition of the right, front drum. He said that there would be loss of friction between the brakes and the drum, and consequently less brake. At 20 to 30 miles per hour, he ventured that the driver would feel a pulsation from the brake pedal—at higher speeds, there would be a vibration and loss of braking. He estimated maximum efficiency of such brakes at 35 to 50 miles per hour, but said a car at such speeds would not be safe in an emergency. From the history of the car given in the hypothetical statement, he said the condition of the car obviously existed from date of manufacture; that if the drum is out of round the brake does not function normally, and that the average driver cannot detect when a drum is out of round. On cross-examination he said heavy braking will cause hydraulic pressure to apply the brake shoes evenly to the drum, if the drum is not out of round. Conversely, a drum out of round produces varying pressures on the brake shoe. He defined "chattering" as a hopping of the brake shoe or lining on an out of round drum. When the pressure is spotty, there is chattering. When shown a mock-up model of a 1965 Plymouth braking system, he pointed out that the shoes on the model were riveted rather than bonded.

At the conclusion of plaintiff's case, motions by each Chrysler defendant to dismiss as to it for failure of the plaintiff to show that her injuries were caused by any failure in her car's braking system were overruled.

Defendant first offered the testimony of two Alabama highway patrolmen who investigated the accident. Sgt. A. D. Wheat actually made the investigation while Corporal J. B. Curtis controlled traffic. Wheat said at the time of the accident he had been a patrolman for five years and had investigated numerous accidents. He refreshed his memory from a copy of his accident report, and drew a sketch of the highway, locating thereon the path traveled by both cars and where both impacts occurred before showing plaintiff's skid marks going abruptly left and down the embankment and Styes' tracks continuing south. He stated that no one appeared to be hurt in plaintiff's car, and that plaintiff did not mention a defect in her braking system, and that he concluded in his report that her car swerved because it was out of control. He and Wheat were both positive that plaintiff's car was removed by a wrecker, contrary to the statements of the plaintiff and the Lambrights who said it was not, but on reexamining their notes admitted that plaintiff left under her own power. Neither patrolman was an eye witness to the accident. The Court finds that their notes and report reflecting that plaintiff lost control of her car which then swerved left are nothing more than conclusions, whereas in fact Wheat's sketch of the scene corroborates the testimony of plaintiff.

Woodrow Barber, an independent automotive damage appraiser, testified that he was employed to inspect plaintiff's car at McCaffrey's body shop after the accident. He followed his standard procedure, visually examining the car, itemizing in sequence the damage, and discussing with a mechanic his appraisal, in this case with Zimmerman. Referring to his report, he showed three wheels as damaged, the steering wheel, and extensive damage to the left rear

quarter panel. After removing the three damaged wheels, which were bent, he visually examined the brake drums and found that the right rear drum needed to be replaced and that in his opinion the front drums were not bent or out of round. In making such an inspection, he stated his practice is to have each wheel elevated from the ground, spin it, and if it wobbles, he checks the drum. He said plaintiff did not mention anything wrong with her brakes, or he would have made a more complete inspection. Zimmerman, on cross-examination, admitted that he and Barber had visually looked at the drums, but said they did not dismantle the brake system for a close inspection, as he did in August 1966, when he measured them with a micrometer.

Grover T. McGee, the service manager for the local Chrysler-Plymouth dealer in Gulfport, acknowledged that plaintiff had brought her car in for service inspection. He said she complained about the gas mileage but did not mention faulty brakes until April 1966 after her accident. At that time he had a mechanic check her brake drums. He said that she had a woman passenger with her and that they, with his mechanic, road-tested the car. The mechanic said he got a pulsation when applying the brake. McGee had the drums taken off and trued at Master Brake and Axle, Gulfport, identified his invoice to Chrysler as an in-warranty job, and said plaintiff appeared satisfied. After that occasion, Earl Hamilton, a Chrysler service representative from Memphis came down and talked to plaintiff. Prior to the trial, McGee located a 1965 Plymouth Fury, equipped with power steering and power braking, as plaintiff's car is, and, with permission of the owner, he and Hamilton road tested it with all braking power sealed off of the right front wheel. He drove at speeds of up to 50 miles per hour and after applying heavy brakes in a panic stop, said there was only a gradual drift to the left for 10 to 15 feet, leaving no skid marks, and that the steering wheel could still be controlled with the pressure of one finger. He and Hamilton took turns running the experiment about three times each, with the same result. He denied, as service manager, receiving any Chrysler bulletins directed to brake or out of round drum problems, occurring in 1965 Plymouths. He stated that the factory required tolerances on brake drums are 1/16th of an inch, and that locally, tolerances are now measured on a turning lathe which Gimma did not have in 1965. In his opinion, "hot spots" on the drum, caused from irregular bonding of the shoe linings, or drums out of round could cause the brake pedal to pulsate, or the chassis to vibrate or chatter, but neither condition would cause loss of control or pull against the direction of the steering wheel. He denied telling plaintiff on her first inspection at Gimma's that her brakes would "seat" or that Chrysler had a policy that drums should not be trued before a vehicle had been driven at least 2000 miles.

Earl Hamilton identified himself as a Chrysler service development specialist, headquartered at Memphis. In 1965 he was a service representative for Louisiana and Mississippi. He admitted receiving a letter from plaintiff in May 1966. On his next trip to Gulfport, he had a lengthy telephone conversation with plaintiff at which time he offered to make a road test of her car, and said she refused. On his company report of her complaint, he admits that he did not note her refusal of a road test. He did note that she was not satisfied. Hamilton said one of his duties was to sign warranty claims and that there would have been no reason for Gimma to decline to have plaintiff's brakes repaired, as Chrysler would have paid the cost plus a 25% mark-up on parts. From his knowledge, he stated that, in a 1965 Plymouth Fury equipped with power steering and power brakes, if one front brake worked more efficiently than the other, the car would drift but not turn abruptly, and the wheel would not jerk from one's hands. He referred to the tests he

and McGee ran on a 1965 Plymouth with power steering and power brakes. They had the right front brake completely blocked off from pressure and put the car in panic stops at 50 miles per hour. He said the car stopped within 50 to 60 feet, drifting and skidding to the left, but that the car did not spin. They tested the car at lesser speeds with no skid. He said that the most common cause of a brake pulling a car out of its normal direction is contamination of the brake lining by oil or dirt, which he would not expect in a new car. On cross-examination he admitted that, in a new car, brake drums being out of round, brake linings not being in proper position, a wheel cylinder not operating properly, or a piston being stuck, all can contribute to a faulty braking system. He stated that the Chrysler, established tolerance for a brake out of round was .006 percent, not 1/16th of an inch as stated by McGee, and that a drum out of round is a common cause of brake pulling. He acknowledged that Chrysler had had this problem with the 1965 Plymouths.

Defendants' last live witness was Charles Feeser, a development engineer in Chrysler's brake department, who from 1956 to 1967, worked primarily on brake linings. He displayed a model mock-up of a 1965 Plymouth braking system in one wheel, taken from a wrecked car. He admitted that the brake shoes were not those originally on the car, that the linings were riveted rather than bonded. The model differed otherwise only in that sections of the drum had been cut away for visual purposes. Photographs of the mock-up were admitted into evidence for the purpose of generally showing the component parts of the braking system and how it works. Feeser had also examined the brake linings or shoes which Zimmerman returned to plaintiff. He defined out of round as meaning the diameter of the drum is not the same at all opposite points. He stated that the distance that separates the surface of the lining from the surface of the shoe is 15/1000ths of an inch. He conceded that Chrysler permits a tolerance in the drum of .006 percent of one inch, later reduced to .002 percent, and that if the tolerance is exceeded by another .006 percent, chatter —a vibration spread throughout the front suspension of the car—would result. In his opinion, if the chatter were severe, it could affect the steering of a car, but not power steering. Gimma's records at the time Master Brake and Axle was supposed to have trued plaintiff's brakes showed that the then mileage was 8,844 miles. If, at that mileage, and if plaintiff's car had chatter and a tendency to pull to the left on brake application, Feeser said he would expect to find far greater wear on the left linings. According to his measurements, he found the greater thickness remaining on the left linings where he would have expected more wear than on the right.

During the waning part of the trial, counsel for both parties invited the Court to participate in a road test of two cars, plaintiff's and the one provided by Gimma, with all braking power in the right front wheels cut off. The Court did so, and found that at successive speeds of 15, 20 and 25 miles per hour, when heavy brakes were applied, both cars skidded left. It was considered too dangerous to make the test at higher speeds.

Upon defendants' offer into evidence of the deposition of Dr. E. C. Hamilton, defendants concluded their case.

Plaintiff offered one rebuttal witness, her sister, who had been with plaintiff when plaintiff first requested McGee, Gimma's service manager, to check her brakes. This witness said she was shocked when McGee laughed and told plaintiff "she wasn't used to a high powered car." The witness verified that she had been in plaintiff's car when the brakes were lightly applied—that the car trembled and the hood shook.

The Court has examined all of the testimony and exhibits in this case and finds that the facts more than bear out plaintiff's contention that her 1965

Plymouth Fury III, at least on two occasions while plaintiff was at the wheel, and on two other occasions when her car was road-tested, once by Zimmerman, and once by Gimma's mechanic, veered and skidded sharply to the left upon the application of vigorous braking; that such action was directly attributable to a faulty braking system, shown by the greater weight of the testimony to be the left front drum dangerously out of round, a condition that had existed from the time the car was sold by Chrysler and consigned by Chrysler Motors to Sevier-Folk Motor Co., Inc. where it was purchased by plaintiff. Although the court normally does not give such credence to mock-ups or road tests that do not precisely lend themselves to a comparison with facts established by either party, the Court is convinced that the right front drum of the brake in plaintiff's car was sufficiently out of round to cause the same kind of lurching and skidding to the left as in the case of the two demonstration cars when all brake pressure was blocked in the right front wheel.

It remains to determine the extent of plaintiff's injuries that are imputable to the accident of October 30, 1965.

In his deposition, offered by defendants, Dr. E. C. Hamilton, a Gulfport physician, who had treated plaintiff off and on for eight or ten years, said that he was a neighbor of plaintiff's and that his office record of November 13, 1965 showed that plaintiff called him within 24 hours of her accident, complaining of a pain in her neck and that she was sore all over, and that he agreed with her that she should have bed rest and take aspirin. He next heard from her on November 10, 1965, by telephone, when she reported that her neck had gotten better and then worse. Hamilton had drug prescriptions delivered to her and told her to come in for x-rays. Plaintiff saw Hamilton again at his home on the following Saturday afternoon. She again described her accident and said her neck and back were hurting whenever she moved. She demonstrated certain mo-

tions which induced the pain. Hamilton said, as they were talking in his yard, he did not examine her, but again advised her to have an x-ray and come in to his office. She had x-rays taken on December 16, 1965 which were essentially normal as to the lumbar area but showed degenerative disc disease in the cervical area. He saw her next, again at his house on December 19, 1965, when she related an episode that had occurred a few days previously in Mobile. She had gone there with a friend, had an evening meal at a restaurant, and as she left the restaurant she got nauseated and became unconscious. She was taken by ambulance to the Mobile Infirmary where she was examined and thought to have blood pressure troubles. Against the advice of the examining physicians, she insisted on returning to Gulfport where she stayed in bed. On the day Hamilton saw her she felt worse and had developed a severe diarrhea. Hamilton had plaintiff admitted to the Gulfport Memorial Hospital where she remained until December 22, 1965, and where various x-rays and blood tests were made. As they were normal, she was discharged. He next saw her on September 30, 1966, at which time she complained of numbness in the left side of her face. Her blood pressure was elevated for which he gave her a prescription for medication. She was not seen by Hamilton again until December 10, 1968, at which time she was complaining of soreness and numbness in her right lower leg. Arterial pulsations in that area were of less volume than in the left leg. Hamilton thought that this onset of numbness was probably related to nerve pain resulting from her back difficulty. He also noted muscle cramps. About February 1966, Hamilton referred plaintiff to Dr. Homer Kirgis, neurosurgeon on the staff of Oschner Foundation Hospital, New Orleans. In response to direct questioning, Hamilton stated that as a result of her accident of October 30, 1965, plaintiff developed a whiplash injury of the neck, better described as musculo ligamentous strain of the cervical spine area and a similar problem in

the lumbar spine area. He said he saw her on a number of occasions in her home when she was in too much pain to get off the sofa. Hamilton acknowledged that in a previous report given to plaintiff's former attorney he referred to plaintiff's statement that her car had swerved off the road due to defective brakes. He also knew that after his February 1966 referral, plaintiff had seen Dr. Kirgis several times, and he himself referred her back to Dr. Kirgis on November 11, 1966, when she complained of low back pain and sciatic radiation down the leg, which Hamilton referred to as a ruptured disc syndrome. Hamilton's report from Dr. Kirgis reflect that Kirgis prescribed conservative treatment.

On questioning by defendants' counsel, Dr. Hamilton said the probable cause of plaintiff's whiplash injuries to her neck and back were the two rear end collisions. On questioning by plaintiff's counsel, to which was added the additional factor of plaintiff's car swerving and going down the embankment, Hamilton said plaintiff's sliding back and forth in the front seat and an attempt to heave herself up against centrifugal force and the slant of the embankment would put a wrenching, twisting force on her back which would also account for the injuries to her neck and back. He acknowledged that prior to her accident, plaintiff had had no spinal problems. He did not try to distinguish the effects of the collisions from the effects of the swerve and going down the embankment.

Plaintiff offered the deposition of Dr. Kendall D. Gregory, internist, of Gulfport. He had treated plaintiff since June 1954, including a complete physical examination in 1955 at which time she had no complaint in reference to her spine. His first time to see her after the October 30, 1965 accident was on June 17, 1969 when she requested medical help in controlling the pain and muscle spasms in her back and neck. His history of her complaints was that since the accident she had severe pains primarily in the lower back area with radiation down the left leg. She had extreme difficulty in walking. She was sleeping on a bed with a cotton pad and board. She was wearing a lower back brace. She had by dieting lost 50 pounds since 1967, but found this to be of no help. She was receiving hydroculator (hot, moist packs) therapy, which gave only temporary relief. She had been to four or five doctors, none of whom had prescribed anything but conservative treatment. Dr. Gregory's examination revealed that plaintiff had bilateral muscle spasm and was in such severe pain that she was unable to lie down or go through a normal examination. His diagnosis was that she had a herniated disc. He prescribed a powerful muscle relaxant, but she was unable to continue taking it because it destroyed her equilibrium. She came back in August 1969 when he was able to take x-rays, although plaintiff stated that she had had repeated x-rays by Dr. Kirgis, by Dr. Paul S. Derian, chief orthopedic, University Hospital, Jackson, Mississippi, and by Dr. Robert N. Ervin, a Gulfport neurosurgeon. Dr. Gregory found a marked limitation of the motion in her lower back area and the muscles in the lumbar area parallel to the spine were swollen, hard and extremely tender. He prescribed continuation of the back brace, a hard bed, moist heat, and recommended simple stretching exercises on the floor. On September 9, 1969, Gregory referred plaintiff to Mr. William Pettey, physiotherapist at Memorial Hospital, Gulfport, who used heat packs and passive exercises to reduce muscle spasm. In October 1969, her results being poor, Pettey was directed by Gregory to try intermittent traction. She received some relief but again had muscle spasms. On November 18, 1969, Gregory prescribed a different type of muscle relaxant and a synthetic codeine-like drug. In January 1970 she had muscle spasms again. In March 1970 she had quit the physical therapy at the hospital and sought new relief. In April 1970, emotionally upset and crying, she asked if Gregory could recommend any other physician or other relief. Dr. Gregory

referred her to Dr. M. S. Corban, an orthopedic in Gulfport. From Dr. Corban's report to Dr. Gregory, Dr. Corban continued the conservative therapy she had been receiving of heat, rest and a back brace. Dr. Gregory saw her again on October 12, 1970 when she was extremely upset, limited in her activities, having marital problems, and depressed over the continued conservative treatment with the hydrocollater, rest, bed board, back brace and stretch exercises from which she got only intermittent relief. On February 15, 1971, she had pain in her left forearm and elbow and an elevated blood pressure. Dr. Gregory attributed the latter to her continued back pain, aggravation and nervous tension. On March 31, 1971, she fell in Dr. Gregory's waiting room when her left leg gave way. In June 1971, she again complained of pain in her back and left sciatic area, and also in the radial nerve area of her right arm. Dr. Gregory thought the latter to be a neuralgia. On November 1, 1971, she reported that her legs had again given way and she had fallen over a chair at her home. In March 1972, new attempts were made by Mr. Pettey to relieve her muscle spasms with traction at the hospital. At this time more x-rays were made which revealed a universally exhibited osteoporosis and some osteoarthritis. The disc spaces were normal. There was some loss of the normal lordotic which he attributed to muscle spasm. In May 1973, she had acute pain and discomfort in the neck area with extreme pain on lateral flexion and extension. Neck x-rays were made for the first time by Dr. Gregory and they showed osteoarthritis, osteoporosis and narrowing of the disc space between C–6 and C–7. This was Dr. Gregory's last time to see her at the time of his deposition. His diagnoses were that plaintiff has osteoporosis and osteoarthritis of the spine, both cervical and lumbar, aggravated by the auto accident in 1965, herniated lumbar disc probably in the space between L–4 and L–5, or L–5 and S–1 with sciatic neuralgia, chronic severe, and osteoarthritis and probable herniated disc of the cervical spine in the area between C–6 and C–7. His prognosis is that from the first time he saw her in 1969 her condition continued to deteriorate. She has almost complete physical impairment as far as her ability to stand and walk. She is unable to do any bending, stooping or pulling or tugging, and she has found that she is unable to do even minor housework such as light sweeping because this will set up muscle spasm. Dr. Gregory further stated her condition is permanent and unfortunately is going to be increasingly more severe until she is completely incapacitated. She is unable to be gainfully employed. It was his opinion, faced with all the facts claimed by plaintiff, that her injuries were caused by the violent motion of the car back and forth and up and down that occurred when her car went down the embankment and her seat belt came loose, rather than to the two bumps on the rear of her car; although he later in his cross-examination admitted that if either of the two rear end collisions were severe, such a bump could cause cervical injury, pointing out, however, that at that time she was still wearing her seat belt which would have protected her back. He said her symptomatology is one of nerve root pressure, caused by a herniated disc or a disc pressing on the nerve itself. His objective findings of muscle spasm, inability to do any leg flexing, and difficulty in her locomotion made him strongly of the opinion that she has a chronic, herniated lumbar disc. He felt that a myelogram could have aided in diagnosis in that, if surgery had been indicated, a myelogram would have determined which level to explore. Gregory himself does not perform myelograms, but said Dr. Corban evidently felt conservative therapy should be continued in place of surgery. Dr. Gregory noted that he received on July 25, 1969, a report from Dr. Derian of his examination of plaintiff on November 19, 1968, at which time Dr. Derian did not rule out the possibility of a herniated disc.

The Court permitted proof of medical costs found to be reasonable and necessary. They include $1149.89 for hospitalization at both Ochsner and Memorial and an orthopedic clinic; $300.00 for Drs. Hamilton, Gregory and Ervin; and $148.08 for miscellaneous items of braces and therapy. The Court is convinced that plaintiff has expended considerable sums for drugs and other medical services she did not offer proof on and that she will have future medical costs. The Court finds that all these expenses are related to her injuries. The Court further finds that her osteoposis and osteoarthritis of the cervical and lumbar spine resulted from or were triggered by the tossing about of her body in the violent swerve and turbulent descent down the embankment in the accident of October 30, 1965, which, in turn, resulted from the aforesaid defective brakes. The Court is also of the opinion that plaintiff has suffered a permanent disability which in all likelihood will prevent any future employment. The Court finds that a consideration of all these factors entitles plaintiff to damages. .

As to strict liability in tort against one who sells any product in a defective condition, Mississippi has adopted the rule stated in Restatement of Torts, Second, # 402A. See State Stove Mfg. Co. v. Hodges, Miss., 189 So. 2d 113; Ford Motor Co. v. Cockrell, Miss., 211 So.2d 833; Ford Motor Co. v. Dees, Miss., 223 So.2d 638, 641. In the last cited case the Mississippi Supreme Court said that under the doctrine of strict liability in tort there is no need to prove that the manufacturer was negligent; if the article left the manufacturer's control in a dangerously unsafe condition, or was not reasonably safe, or was unsafe for its intended use, the manufacturer is liable.

This Court finds that plaintiff's 1965 Plymouth Fury III was in a dangerously unsafe condition and was unsafe for its expected use; that plaintiff's injuries resulted therefrom, and that she is entitled to the full sum of $55,000.00, as compensation for her injuries, temporary and permanent, pain and suffering that she has had and will have in the future, and loss of employment ability.

Because no proof was offered that Chrysler Motors ever had the vehicle in its separate custody or the duty to inspect for other than obvious defects, the damages will be assessed only against Chrysler Corporation.

An appropriate judgment may be submitted with all court costs assessed to the defendants.