211 So.2d 833 (1968)
FORD MOTOR COMPANY
v.
Will COCKRELL.
No. 44871.
Supreme Court of Mississippi.
May 27, 1968.
Rehearing Denied July 8, 1968.
*834 Watkins & Eager, Hassell H. Whitworth, Jackson, for appellant.
Crisler, Crisler & Bowling, Francis S. Bowling, Jackson, George B. Grubbs, Mendenhall, for appellee.
ROBERTSON, Justice:
This is a strict liability in tort case against a manufacturer of automobiles and trucks and its authorized retail dealer. Will Cockrell brought suit against Ford Motor Company, and William Allen, d/b/a Mendenhall Motor Company, to recover damages for personal injuries sustained when the starter of a Ford truck, without human agency, became engaged, causing the motor to turn and the truck to move forward, and pinning the plaintiff against the rear of a parked truck, thereby severely injuring him.
The jury returned a verdict for $19,500 against Ford Motor Company only. Appellant thereupon perfected its appeal from the judgment of the Circuit Court of Simpson County based on the verdict of the jury.
On February 5, 1966, the Town of Mendenhall, Mississippi, bought a new 1966 Ford F600 chassis cab truck from Mendenhall Motor Company, the authorized Ford dealer in Mendenhall. This truck had been purchased new by the dealer from Ford Motor Company, the manufacturer. Before delivery to the purchaser, the truck had been driven to Jackson and a dump body installed thereon.
The truck was bought to haul gravel and other road-building materials and had been used exclusively for this purpose. It was used during daylight hours only and at night was parked, along with other Town of Mendenhall trucks, on a street behind the Town Hall. As was the usual custom, the ignition key was left in the parked truck.
About 6:30 a.m. on June 15, 1966, Ellis Monk, Will Cockrell, and two other town workmen gathered back of the Town Hall to pick up their trucks and begin work for the day. Monk, the driver of the new 1966 Ford truck, put a tool box in the cab of his truck from the passenger's side and closed the door. Between one and two minutes later, as Monk rejoined the group, somebody noticed smoke coming from under the hood of Monk's truck. Will Cockrell, who was closest to the truck, ran over to the front of the truck to raise the hood. Before he could raise the hood, the starter became engaged, causing the motor to turn, and the truck, which had been parked in second gear, moved forward two or three feet, pinning Cockrell against the rear of another parked truck.
Monk, the regular driver, moved the gear from second to reverse, and backed it off of Cockrell. Even though the ignition key was in the "off" position and Monk never attempted to start the truck, the motor continued to turn until the battery ran down some minutes later. The plaintiff suffered a broken right arm, injuries to his right shoulder, and several broken ribs.
*835 Mendenhall Motor Company was contacted, pulled the truck in, removed the burnt and charred wiring, and installed new wiring underneath the hood and the fender apron. The repairs totalled $32.41 and consisted of $20.46 for parts and $11.95 for labor. The testimony was that the truck had been running fine ever since.
The Mendenhall Motor Company itemized parts and labor on a "Combination Repair Order and Adjustment Claim" form furnished by Ford Motor Company. This Adjustment Claim form was sent in to the Ford Motor Company, was okayed by it on August 1, 1966, and the total claim paid by it to Mendenhall Motor Company. This form showed the Date of Sale as 2/5/66, the Date of Repair as 6/15/66, and the mileage as 5,154 miles. The truck thus was 4 months and 10 days old and had been driven a total of 5,154 miles.
Under the headings "Instructions to Mechanic No. ____" and "Describe Cause and Nature of Defect," on the Adjustment Claim form, Watts Williamson, the service manager of Mendenhall Motor Company, had written:
"Burnt wires  Replace wire loom from Dash to Engine Comp  Replace Battery to Relay Switch  Replace Starter Solenoid Switch  Repair wires  Wire Loom in Engine Comp. shorted out on fender apron causing wire Loom and Battery Cable to burn and switch to short out  causing starter to turn."
The appellant assigned as error the following:
"1. The lower Court erred in failing to grant a directed verdict and a peremptory instruction to Appellant for the reason that, as a matter of law, Appellee wholly and completely failed to make out a prima facie case of negligence against Appellant as alleged in the Declaration.
"2. The lower Court erred in failing to grant a directed verdict and a peremptory instruction to Appellant for the reason that, as a matter of law, Appellee wholly and completely failed to offer any proof, if believed, which would tend to prove that the vehicle in question was in a defective condition unreasonably dangerous to the user or consumer at the time the vehicle left the possession of Appellant.
"3. Alternatively, the lower Court erred in refusing and failing to grant Appellant a new trial for the reasons:
"(a) The jury was allowed to hear answer of witness, Edward Wallace, to hypothetical question propounded by Appellee, over the objection of Appellant, in absence of which, no evidence was available on which a verdict could have been returned against Appellant;
"(b) The verdict of the jury was against the overwhelming weight of the law and evidence."
In tracing the history of the doctrine of strict liability in tort, Chief Justice Ethridge, in State Stove Manufacturing Company v. Hodges, 189 So.2d 113 (Miss. 1966), said:
"In 1916 Judge Cardozo, in MacPherson v. Buick Motor Company, held, in a suit against the manufacturer of an automobile with a defective wheel, that the maker was liable for negligence. By placing the car on the market, it assumed a responsibility to the consumer, resting not on contract but upon the relation arising from the purchase, together with the foreseeability of harm if proper care was not used. 217 N.Y. 382, 111 N.E. 1050, L.R.A. 1916F, 696 (1916); Prosser, Torts 658-661 (3d ed. 1964).
"Prosser summarizes the effect of MacPherson in subsequent cases in this way:
"`This decision found immediate acceptance, and at the end of some forty years is universal law in the United States, with the barely possible but highly unlikely exception of Mississippi. Massachusetts, which was one of the last jurisdictions to capitulate, has said that "The MacPherson case caused the exception to swallow the *836 asserted general rule of nonliability, leaving nothing upon which that rule could operate." Some of the courts have continued to speak the language of "inherent danger," but it seems clear that this now means nothing more than that substantial harm is to be anticipated if the chattel should be defective. * * * It is certainly the prevailing view that it extends to any product whatever which, if in fact negligently made, may reasonably be expected to be capable of inflicting injury. * * *
"`The conclusion is clear that the duty extends to any one who may reasonably be expected to be in the vicinity of the chattel's probable use, and to be endangered if it is defective. * * *'

* * * * * *
"The rule which we adopt extends to any product which, if in fact negligently made, may reasonably be expected to be capable of inflicting injury. Privity of contract is not necessary in a suit by a consumer against a manufacturer." (Id., 189 So.2d at 115-116) (Emphasis added)

* * * * * *
"[W]e conclude that the appropriate standards of responsibility are well stated in Section 402A of the American Law Institute's Restatement of Torts (Second) * * *:
"`Special Liability of Seller of Product for Physical Harm to User or Consumer  "`(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
"`(a) the seller is engaged in the business of selling such a product, and
"`(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
"`(2) The rule stated in Subsection (1) applies although
"`(a) the seller has exercised all possible care in the preparation and sale of his product, and
"`(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.'
"The foregoing rule is not exclusive. It does not preclude liability based upon the alternative ground of negligence of the manufacturer or seller, where such negligence can be proved. Restatement (Second), Torts at 348. (Id. at 118.)

* * * * * *
"The rationale of this rule is well stated in Greenman v. Yuba Power Products, Inc., 59 Cal.2d 57, 27 Cal. Rptr. 697, 377 P.2d 897, 13 A.L.R.2d 1049 (1962). Plaintiff was injured while using a power tool, given to him by his wife, who had purchased it from a retailer. The evidence showed that there were inadequate set screws installed by the manufacturer, which permitted the lathe to move away from the piece of wood, allowing it to fly out of the lathe and hit plaintiff on the head. Affirming a judgment for plaintiff against the manufacturer, the California Supreme Court said:
"`A manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being. Recognized first in the case of unwholesome food products, such liability has now been extended to a variety of other products that create as great or greater hazards if defective. * * *
"`Although in these cases strict liability has usually been based on the theory of an express or implied warranty running from the manufacturer to the plaintiff, the abandonment of the requirement of a contract between them, the recognition that the liability is not assumed by agreement but imposed by law * * *, and the refusal to permit the manufacturer to define the scope of its own responsibility for defective products * * * make clear that the liability *837 is not one governed by the law of contract warranties but by the law of strict liability in tort. Accordingly, rules defining and governing warranties that were developed to meet the needs of commercial transactions cannot properly be invoked to govern the manufacturer's liability to those injured by their defective products unless those rules also serve the purposes for which such liability is imposed.
"`The purpose of such liability is to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves. Sales warranties serve this purpose fitfully at best. * * * Implicit in the machine's presence on the market, however, was a representation that it would safely do the jobs for which it was built. * *'" (Id., 189 So.2d at 119-120) (Emphasis added)
In further explaining our concept of the doctrine of strict liability in tort, we said in State Stove:
"It is strict in the sense that there is no need to prove that the manufacturer was negligent. If the article left the defendant's control in a dangerously unsafe condition, or was not reasonably safe, or was unsafe for its intended use, the defendant is liable whether or not he was at fault in creating that condition, or in failing to discover and eliminate it. Ordinarily the phrase `defective condition' means that the article has something wrong with it, that it did not function as expected. However, where the article was made as intended, and yet proves to be not reasonably safe, the phrase `defective condition' has no independent meaning. Wade, 19 Swl.L.J. at 15. The issue is whether the product is `unreasonably dangerous' or not reasonably safe. As was said in Morrow v. Caloric Appliance Corp., 372 S.W.2d 41, 55 (Mo. 1963), it should be `fit and reasonably safe for use by the "consumer" when used in the manner and for the purpose for which they are manufactured and sold * * *.' In other words, the Restatement rule of Section 402A `applies only where the product is, at the time it leaves the seller's hands, in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him,' or not reasonably safe. Restatement (Second), Torts, Section 402A, comment g.
"The manufacturer is liable strictly in tort only if (a) he puts on the market a product which is not reasonably safe, and (b) the plaintiff is injured as a result of a contemplated use of it. The action is different from negligence mainly in the element of scienter: Plaintiff will not need to prove either that defendant negligently created the unsafe condition of the product or that he was aware of it. Wade, 19 Sw.L.J. at 15, 25. * * * It is a question of fact whether the particular article involved was reasonably safe when it left the control of the manufacturer." (Id., 189 So.2d at 120-121) (Emphasis added)
The testimony was that the Ford truck was purchased new on February 5, 1966, from the authorized Ford dealer, that before delivering the truck the authorized Ford dealer thoroughly checked the truck in accordance with a predelivery check sheet furnished by the Ford Motor Company. This check sheet did not require an inspection of the wiring system; however, the lights, the windshield wipers, the starter, and other accessories operated through the electrical system were checked. There were no changes whatsoever required or made in the wiring system. The truck was driven by only one driver, who testified that it was not abused in any way, that it was used only for the purpose for which it was purchased, that is, to haul gravel and other road-building materials. The truck actually was used during daylight hours only, never at night. The truck was four months and ten days old and had been driven only 5,154 miles at the time that the *838 wiring system without warning gave trouble. The testimony of William Shanks, a quality control engineer for Ford Motor Company, was especially enlightening on the age and mileage question. He testified as follows:
Q. Now, when you sell these trucks like this truck, you anticipate that it's going to be used on rough ground?
A. Yes, sir.
Q. And hauling gravel and sand and materials of that nature?
A. It's tested to do that.
Q. Yes, sir, and when you test it to do that you do not expect the wires to short out within five thousand miles, do you?
A. We do not.
Q. And you will agree with me that under normal use if the wire does short out within five thousand miles that something is wrong, will you not, sir?
A. That's logical.
Q. Yes, sir, and they don't catch on fire, these harness system, unless a short appears in the system somewhere, do they?
A. Something has to happen to them.
Q. Yes, sir.
A. They'll go many, many miles further than that without trouble.
Q. If it's installed and inspected properly?
A. Yes, sir.
Mr. William Allen, trading as Mendenhall Motor Company, the seller of this truck, testified that Ford Motor Company paid his claim for replacing the burned and charred wires taken out of the Ford truck that caused the injuries to Cockrell. In connection with this reimbursement by Ford Motor Company, Allen testified:
Q. Do they replace parts that are damaged by the customers after the customer has taken charge of the vehicle and is operating it?
A. Mr. Bowling, if the parts are defective through workmanship or material, yes, not through abuse, not through negligence on the part of the customer, not on a part that is worn out, but through any part that's defective through the workmanship or material of that particular part.
It will bear repeating that Ford Motor Company did not question the adjustment claim sent in by Mendenhall Motor Company, but paid off promptly.
Edward Wallace was called as an expert by the plaintiff. He testified that he had been a truck mechanic for thirty-five years, that he had rebuilt trucks from the ground up, including motors, tranmissions, wiring systems, gear boxes and brakes. He stated that he had eight mechanics in his employ, that 95% of his business was the maintaining, servicing and repairing of Irby Construction Company and Stuart C. Irby Company trucks, totalling about 670 trucks and including at least 200 Ford trucks. We feel that Wallace was qualified as an expert witness.
Wallace was asked a comprehensive question tracing the history of this 1966 Ford truck from the time of its purchase till the incident complained of and including statements of fact taken from the combination repair order and adjustment claim filled out by Watts Williamson, the service manager of Mendenhall Motor Company. Wallace gave it as his positive opinion that *839 if the electrical wiring had been properly installed to begin with and if it had been properly inspected that this trouble in the electrical system would never have happened.
On cross-examination, Wallace testified:
Q. You say assuming all those facts given to you by Mr. Bowling that if it was determined that a short circuit had occurred along the fender skirt, that that would indicate to you in your opinion a manufacturing defect or a failure of a proper inspection?
A. That's right, if no other inspection had been made on the truck, I would say it would go back to the manufacturer.
Q. Alright [sic], sir, now, then, you rule out any other causes as having anything to do with this fire and this short circuit, is that correct?
A. I do, yes, sir.
There is oral and documentary evidence, and there is direct and circumstantial evidence that there was a latent defect in the wiring system of this truck. This concealed defect was located by witnesses under the fender apron and under the hood close to the solenoid starter switch. This defect was traced back to, and tied in with, the manufacture and assembly of this truck by the Ford Motor Company. There was testimony that if this truck had been properly assembled or properly inspected by the manufacturer that this defect would not have been present, or would have been discovered and remedied. This question of fact was properly submitted to the jury to decide. There is substantial evidence supporting the verdict of the jury. We affirm the judgment of the trial court.
Affirmed.
GILLESPIE, P.J., and RODGERS, PATTERSON, and SMITH, JJ., concur.