# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2009-CA-01314-SCT

*M. CURTISS MCKEE AND ANN CRAFT MCKEE*

*v.*

*BOWERS WINDOW & DOOR COMPANY, INC.*
*AND WEATHER SHIELD MANUFACTURING,*
*INC.*

| | |
|---|---|
| DATE OF JUDGMENT: | 07/01/2009 |
| TRIAL JUDGE: | HON. MARCUS D. GORDON |
| COURT FROM WHICH APPEALED: | MADISON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | DENNIS L. HORN |
| | SHIRLEY PAYNE |
| ATTORNEYS FOR APPELLEES: | J. WADE SWEAT |
| | MARISA CAMPBELL ATKINSON |
| | TIMOTHY DALE CRAWLEY |
| | MITZI LEASHA GEORGE |
| NATURE OF THE CASE: | CIVIL - PROPERTY DAMAGE |
| DISPOSITION: | AFFIRMED - 04/21/2011 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

## CONSOLIDATED WITH

## NO. 2009-CA-01315-SCT

*M. CURTISS MCKEE AND ANN CRAFT MCKEE*

*v.*

*WEATHER SHIELD MANUFACTURING, INC.*
*AND BOWERS WINDOW & DOOR COMPANY,*
*INC.*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/06/2009 |
| TRIAL JUDGE: | HON. MARCUS D. GORDON |
| COURT FROM WHICH APPEALED: | MADISON COUNTY CIRCUIT COURT |

ATTORNEYS FOR APPELLANTS:        DENNIS L. HORN
                                 SHIRLEY PAYNE
ATTORNEYS FOR APPELLEES:         TIMOTHY DALE CRAWLEY
                                 MITZI LEASHA GEORGE
                                 J. WADE SWEAT
                                 MARISA CAMPBELL ATKINSON
NATURE OF THE CASE:              CIVIL - PROPERTY DAMAGE
DISPOSITION:                     AFFIRMED - 04/21/2011
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**EN BANC.**

**RANDOLPH, JUSTICE, FOR THE COURT:**

¶1.     In 1998, the McKees entered into a home-construction contact with Ellington Homes, Inc. ("Ellington Homes"). Thereafter, the president of Ellington Homes instructed the McKees to look at windows at Bowers Window & Door Co., Inc. ("Bowers Window"). At Bowers Window, a salesman showed the McKees various types of windows. Ann McKee told him that she preferred wooden windows. The salesman cautioned the McKees that wooden windows would need to be maintained because "wood rots . . . ." Ultimately, the McKees selected wooden windows designed and manufactured by Weather Shield Manufacturing, Inc. ("Weather Shield").

¶2.     The windows were installed by either Ellington Homes or its subcontractors, with no involvement by either Bowers Window or Weather Shield. In August 1999, the McKees moved into their new, lakefront home. Soon thereafter, the McKees experienced a multitude of problems related to construction, including leaking windows. By the spring of 2002, the wooden windows were rotting. Subsequently, the home underwent a significant reconstruction to remedy its various problems.

2

¶3.     In September 2002, the McKees filed suit against Ellington Homes,[1] Weather Shield, and Bowers Window. While acknowledging that the home had multiple problems which did not pertain to either Weather Shield or Bowers Window, the McKees alleged that the window manufacturer and the window seller were liable because the wooden windows were "a defective product in that they have leaked ever since they were placed in the house." After the circuit court entered a pretrial order excluding expert testimony by the McKees' designated expert regarding the defectiveness of the windows, both Weather Shield and Bowers Window filed "Motions for Summary Judgment." Following separate hearings, the circuit court granted summary judgment in favor of Weather Shield and Bowers Window.

**FACTS**

¶4.     On August 28, 1998, the McKees entered into a home-construction contract with Ellington Homes. Thereafter, according to Ann McKee, the sole proprietor of a realty company, the McKees were instructed by James R. Ellington, the president of Ellington Homes, "to go and look at windows at Bowers [Window]." The deposition testimony of Ann McKee provided that the salesman at Bowers Window, Mark McKee (no relation), did not recommend particular windows, but instead "just discussed different windows and . . . window surface . . . ." Mark McKee showed the McKees various types of windows, including vinyl, metal, and wooden windows. According to Ann McKee, "I probably said that we had come from a house that had wood windows, and *I liked wood windows*." (Emphasis added.) This was corroborated by the deposition testimony of Curtiss McKee,

---

[1] The McKees have since entered into a settlement with Ellington Homes.

3

which provided that "I think Ann said that she liked wood, that the metal wasn't as pretty." According to Ann McKee, the salesman responded "that if we wanted wood, we'd have to maintain them because wood rots, and . . . I remember saying, 'Yes, we've had wood windows, and we maintain them.'" While Ann McKee could not recall how the specific windows were selected, Curtiss McKee stated that the McKees were informed by Mark McKee that the Weather Shield windows which were selected were "top of the line."

¶5. The wooden windows were designed and manufactured by Weather Shield and, in December 1998 and January 1999, were delivered to Bowers Window.[2] Later, the windows were transported to the construction site where, according to Ann McKee, they were "safely stored out of the weather in the house garage." The installation of the windows was performed by either Ellington Homes or one of its subcontractors, with no involvement by either Weather Shield or Bowers Window. The McKees were not present when the windows were installed.

¶6. On or about August 20, 1999, the McKees began residing in the lakefront home. According to Ann McKee, following "the first really heavy rain, we had water that went from the window near Curtiss's desk area . . . . We were standing in water." Over the next several months, the McKees claimed that the windows had leaked whenever it rained, and that Ellington Homes repeatedly had sent employees to inspect the windows. According to Ann McKee, Ellington initially believed the problem was the caulking and the rubber seals, then finally informed the McKees that he had no further solutions.

_____

[2]No evidence was adduced that Bowers Window altered or modified the windows in any fashion. Bowers Window also offered evidence that it was not involved in the assembly of the windows ordered by the McKees.

4

¶7.    In the spring of 2002, the McKees contacted Bill Birdsong, Jr., to view their home and determine if it needed to be painted or pressure-washed.  Birdsong observed the trim and fascia, and noticed that the windows were rotting "along the bottom, along the stool, the window sill on the outside, and about four or five inches up on each side . . . ."  Birdsong did not "tear the windows open" to see if there was any moisture barrier around them or inspect whether the windows were properly installed and sealed and/or caulked.  Birdsong did not even attempt to open any of the windows.

¶8.    Birdsong did not proceed with painting the home and "[l]eft them to decide what to do."  Subsequently, the home underwent major reconstruction, which, according to Curtiss McKee, cost $528,000.  Residential builder Jeb Stewart was involved in the reconstruction, and provided deposition testimony that it included "demo[ing] the house, and tak[ing] the EIFS[3] off the outside of the house, and go[ing] back with real stucco and replac[ing] the windows,[4] and redo[ing] the interior where the damage was."  According to Stewart, "almost every" wooden window "was rotten."[5]  Stewart further stated that there was no waterproofing around any of the windows, no moisture barrier placed above some windows, and that some windows were installed using "[p]oor framing technique."[6]

---

[3]Exterior Insulation and Finishing System, a synthetic stucco.

[4]The wooden windows were replaced with metal-clad windows.

[5]Stewart could not determine if the windows had been painted within six months of initial installation.  Had this not occurred, Stewart stated that rot was a natural consequence.  No evidence was offered that the windows had been painted.

[6]Similarly, Curtiss McKee stated that carpenters informed him during the reconstruction "that the flashing was inadequate or was not there . . . , that the windows were not installed correctly."

5

¶9.    Additionally, the home of the McKees' next-door neighbors (one of whom was Ann McKee's cousin) was also constructed by Ellington Homes.  According to the McKees, that home had "similar . . . leaking, intruding water[,]" and "just . . . multiple problems . . . ."  The McKees further stated that they did not believe the windows used in that home were manufactured by Weather Shield.

¶10.    In their Complaint, the McKees acknowledged that their home had numerous problems which did not implicate either Weather Shield or Bowers Window.[7]  Count Two of the Complaint stated that the windows manufactured by Weather Shield and purchased from Bowers Window were "*a defective product* in that they have leaked ever since they were placed in the house."  (Emphasis added.)  Count Three of the Complaint provided that

_____

[7]Count One of the Complaint provided that Ellington Homes had failed to construct the home "in a workmanlike manner fit for habitation . . . ."  Specifically, the McKees alleged that:

> the area surrounding multiple windows placed in the back of the house has constantly leaked rainwater into the house, causing damage both to the frame around the windows inside and outside of the house and the walls and baseboards of the house; the baseboards under the windows have rotted; the frames surrounding the windows are beginning to rot; these windows include large "picture" type windows and the [McKees] fear that with the frame around the windows rotting that the windows may fall, causing bodily injury; the floor leading to the upstairs bedroom slopes; the return air chases were not properly sealed; the stone veneer on the front of the house was laid without any allowance for seepage of moisture in the stone wall cavity; the roof leaks; the master vanity marble top has cracked; the security system has failed; the EIFS in place, Dryvit Outsulation, was improperly installed, *inter alia*, with improper sealant or no sealing and/or improper flashing or no flashing along, and/or over and/or around the windows, fascia boards, stone roof line, planter box, rear wall, doors, and brick mold; the automatic electronic shutters are broken and the house must have mold remediation because of moisture intrusion due to improper construction.

6

the defendants were "jointly and severally liable for the leaking into the house and the damage caused thereby to the house structure[,]" which included reference to defects "proximately caused" by "the defective windows manufactured by [Weather Shield] and sold by [Bowers Window]."

¶11. On April 3, 2007, the McKees filed their "Designation of Experts." Regarding the defectiveness of the windows, the McKees designated Birdsong as their expert. Thereafter, Weather Shield filed a "Motion In Limine to Conduct *Daubert*[8] Hearing and Exclude Expert Opinion Testimony of Bill Birdsong," which was joined by Bowers Window. Following hearing, the circuit judge concluded that, while Birdsong "would be qualified as a lay person to give an opinion[,]" it would be "very difficult to find that . . . the decisions of [*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999)], [*Miss. Transp. Comm'n v. McLemore*, 863 So. 2d 31 (Miss. 2003)], . . . would qualify him under the facts of this case and with his testimony to give testimony as an expert." The circuit court then entered an "Order Granting Motion to Exclude Expert Witness Testimony of William Birdsong."

¶12. Subsequently, Bowers Window filed a "Motion for Summary Judgment" which maintained that the McKees could not establish "the necessary elements to prove the wooden windows purchased from Bowers [Window] were defective[,]" or "meet their burden of

---

[8] *See* ***Daubert v. Merrell Dow Pharms., Inc.***, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

proof with regard to their negligence claims . . . ."[9]  Following hearing, the circuit court granted Bowers Window's "Motion for Summary Judgment."

¶13.    Next, Weather Shield filed a "Motion for Summary Judgment" which maintained that the McKees had failed to establish that the windows had been "designed in a defective manner" when they had left Weather Shield's control, or that "the 'failure' is anything more than an inherent characteristic of that product – the fact that wood rots."  Following hearing, the circuit court entered an "Order Granting Weather Shield Manufacturing, Inc.'s Motion for Summary Judgment."

¶14.    Subsequently, the McKees timely filed "Notice of Appeal" regarding the "Order Granting Motion to Exclude Expert Witness Testimony of William Birdsong," the "Order Granting Bowers Window and Door Co., Inc.'s Motion for Summary Judgment," and the "Order Granting Weather Shield Manufacturing, Inc.'s Motion for Summary Judgment." This Court consolidated the appeal of those rulings.

## ISSUES

¶15.    This Court will consider:

    (1) Whether the circuit court abused its discretion in excluding Bill Birdsong
    from providing expert testimony.
    (2) Whether the circuit court erred in granting summary judgment in favor of
    Weather Shield and Bowers Window.

---

[9]However, this Court notes that an examination of the McKees' "Second Supplemental and Amended Complaint" reveals no claims of negligence against Bowers Window.

## ANALYSIS

### I. Whether the circuit court abused its discretion in excluding Bill Birdsong from providing expert testimony.

¶16.  "[T]he admission of expert testimony is within the sound discretion of the trial judge. . . . Therefore, the decision of a trial judge will stand 'unless we conclude that the discretion was arbitrary and clearly erroneous, amounting to an abuse of discretion.'" *Kilhullen v. Kansas City S. Ry.*, 8 So. 3d 168, 172 (Miss. 2009) (quoting *McLemore*, 863 So. 2d at 34). *See also* *Moss v. Batesville Casket Co., Inc.*, 935 So. 2d 393, 404 (Miss. 2006) (citing *Tunica County v. Matthews*, 926 So. 2d 209, 216 (Miss. 2006)) ("[a]s the trial court operates as the gatekeeper as to the admissibility of expert testimony, we examine the trial court's decision under an abuse of discretion standard of review").

¶17.  Mississippi Rule of Evidence 702 states that:

> [i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Miss. R. Evid. 702.  "This rule makes it necessary for a trial court to apply a two-pronged inquiry when evaluating the admissibility of expert testimony: (1) is the witness qualified, and (2) is the testimony relevant and reliable?" *Watts v. Radiator Specialty Co.*, 990 So. 2d 143, 146 (Miss. 2008) (citing *McLemore*, 863 So. 2d at 35).

¶18.  Regarding qualifications, "a witness need not be a specialist in any particular profession to testify as an expert. . . . The scope of the witness's knowledge and experience,

9

and not any artificial classification, governs the question of admissibility." ***Univ. of Miss. Med. Ctr. v. Pounders***, 970 So. 2d 141, 146 (Miss. 2007) (citations omitted). *See also* ***Calvetti v. Antcliff***, 346 F. Supp. 2d 92, 110-11 (D.D.C. 2004) (quoting ***Lohrenz v. Donnelly***, 223 F. Supp. 2d 25, 35-36 (D.D.C. 2002)) ("An individual may be deemed an expert based on 'intense practical experience' in the particular field."); ***Cain v. Mid-South Pump Co.***, 458 So. 2d 1048, 1050 (Miss. 1984) ("[F]ormal education is not the only means of becoming an expert in a field. A witness may qualify to give an expert opinion through his experience only."). As to relevance, Mississippi Rule of Evidence 401 "favors admission of the evidence if it has any probative value[,]"[10] and "[t]he threshold for admissibility of relevant evidence is not great." ***Investor Res. Servs., Inc. v. Cato***, 15 So. 3d 412, 417 (Miss. 2009) (quoting ***McLemore***, 863 So. 2d at 40). Finally, in its gate-keeping role, the trial court must also "examine the reliability" of the expert's opinion. ***Janssen Pharmaceutica, Inc. v. Bailey***, 878 So. 2d 31, 60 (Miss. 2004). "In evaluating reliability, the court's '*focus . . . must be solely on principles and methodology*, not on the conclusions that they generate.' ***Daubert***, 509 U.S. at 595 . . . . Expert testimony admitted at trial must be based on *scientific methods and procedures, not on unsupported speculation or subjective belief*." ***Hubbard v. McDonald's Corp.***, 41 So. 3d 670, 675 (Miss. 2010) (emphasis added). *See also* ***Gulf South Pipeline, Co. v. Pitre***, 35 So. 3d 494, 499 (Miss. 2010) ("[M]erely speculative expert opinions should not be admitted."); ***Edmonds v. State***, 955 So. 2d 787, 792 (Miss. 2007)

---

[10]"'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Miss. R. Evid. 401.

("[A] court should not give . . . an expert carte blanche to proffer any opinion he chooses.");

*McLemore*, 863 So. 2d at 37 (quoting *Kumho Tire*, 526 U.S. at 157) ("[N]either *Daubert* nor the Federal Rules of Evidence requires that a court 'admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert,' as self-proclaimed accuracy by an expert [is] an insufficient measure of reliability.").

¶19. Regarding the defectiveness of the windows, the McKees designated Birdsong, a "home building contractor[,]" who was:

> expected to testify that the wooden windows in the McKees' house, which windows are on a lake, were not appropriate for a location with that much moisture and humidity. Those wooden windows did not meet the standard in the industry for that location and caused rot and damage to the McKees' house. . . . [Birdsong] is also expected to testify that appropriate windows would not have rotted within two years.[11]

¶20. At his deposition, Birdsong stated that he had twenty-four years of experience as a general contractor in the metro Jackson area. Birdsong acknowledged that he had never worked for a window manufacturer or window seller; had no special education, training, or experience specific to windows; had no professional resume or curriculum vitae; and had

---

[11] As to the windows, the McKees also designated John Noble of the Madison County Permit Department who, along with Birdsong, was "expected to testify that the lower large windows in the den of the house should have been of tempered glass because the Madison County . . . building code required that . . . in 1999 . . . ." Birdsong's deposition testimony provided that he was "almost positive" that the windows did not meet those applicable building code standards. Yet both Birdsong and Stewart also stated that this safety issue had no relevance to water intrusion, and there was no indication that any of the windows had shattered. As the McKees' suit against Weather Shield and Bowers Window is predicated upon product liability, this Court concludes that the untempered-glass issue is without merit. *See* Miss. Code Ann. § 11-1-63(a)(iii) (Rev. 2002) ([C]laimant must prove by a preponderance of the evidence that "[t]he defective and unreasonably dangerous condition of the product proximately caused the damages for which recovery is sought.").

11

never previously testified as an expert witness in any capacity. Moreover, Birdsong conceded that, although he had been retained by the McKees, he had prepared no notes or written reports regarding his one-time, exterior observations of the McKees' windows and that, in formulating his opinions, he had reviewed no documents from other experts or sources, such as books, magazines, treatises, articles, or other publications.

¶21. According to Birdsong, the "bulk of the problem" with the windows was water intrusion, as "water came through the bottom seal of the window, the sash, and *probably, I assume* that it went from there to in behind the stucco . . . ." (Emphasis added.) Yet Birdsong admittedly made only a one-time, exterior inspection of the windows in the spring of 2002, in which he did not check for underlying moisture barriers or proper sealing and/or caulking. Birdsong also did not know if the wooden windows rotted because they "didn't get painted or primed or what happened . . . ." Instead, Birdsong opined that finger-jointed,[12] exterior, wooden windows "ought to be illegal" in central Mississippi, as even if they were properly primed and painted, "it's all going to rot."[13] With that said, Birdsong acknowledged that many Mississippi homes have such wooden windows; that wooden windows manufactured by Anderson, Pella, and Marvin are sold in Mississippi; and that he knew of no industry standard or building code which prohibited the use of wooden windows. Yet according to Birdsong, such windows "[d]on't meet *my standard*" for residential construction "[a]nywhere in Mississippi" based upon "*Birdsong common sense*[,]" and that metal or vinyl

---

[12]According to Stewart, "finger-joint" means "instead of taking a solid piece of stock, they'll make a board out of scraps, and they'll finger-joint it together and glue it."

[13]According to Birdsong, he would install wooden windows only if the owners "were just hell bent on having them."

windows would not have rotted within two years. (Emphasis added.) But Birdsong added that he had never published his personal standard regarding the use of wooden windows in Mississippi and was aware of *no* other general contractor who had adopted his personal standard.

¶22. Thereafter, Weather Shield filed a "Motion In Limine to Conduct ***Daubert*** Hearing and Exclude Expert Opinion Testimony of Bill Birdsong," which Bowers Window joined. At the motion hearing, Birdsong testified that he had previously installed, repaired, or replaced "thousands" of windows, and that he had built or manufactured "under a hundred" windows. According to Birdsong, during his 2002 exterior observation of the McKees' home, he noticed rot in "more than ten and less than fifty" windows. Regarding the underlying problem, Birdsong "couldn't say whether it was the priming or whether it was not flashed or . . . what, other than it just deteriorated and when it leaked from the bottom, it leaked right onto the house." But Birdsong further stated that finger-jointed, exterior, wooden windows were "as cheap as you can get"[14] and were unsuitable for the McKees' home given its proximity to the lake and its general geographic location in central Mississippi. Birdsong estimated that "ninety percent of finger-joint exterior windows that I've looked at over twenty-four years have had problems[,]" and reasserted that "the only time I would [install finger-jointed, exterior, wooden windows] is if . . . the homeowner themselves said this is what I want." Yet Birdsong again acknowledged that finger-jointed,

---

[14]Birdsong conceded that he did not know the price of the windows in the McKees' home.

13

exterior, wooden windows have "been accepted" in the industry and that such windows have been used in thousands of Mississippi homes.

¶23.    The circuit judge summarized Birdsong's testimony as follows, "he was involved with construction, evaluation of homes of all values, . . . and he finally . . . gave an opinion that the . . . finger-joint window should be outlawed and not allowed although . . . it is still in use." Based thereon, the circuit judge concluded that, while Birdsong "would be qualified as a lay person to give an opinion[,]" it would be "very difficult to find that . . . the decisions of [*Kumho Tire*, 526 U.S. at 137], [*McLemore*, 863 So. 2d at 31], . . . would qualify him under the facts of this case and with his testimony to give testimony as an expert."[15] The circuit court then entered an "Order Granting Motion to Exclude Expert Witness Testimony of William Birdsong."

¶24.    In evaluating the admissibility of Birdsong's proposed expert testimony, this Court finds a myriad of problems at each level of the analysis. Without question, "[a] witness may qualify to give an expert opinion through his experience only." *Cain*, 458 So. 2d at 1050. *See also* Miss. R. Evid. 702 (a witness may be "qualified as an expert by . . . experience . . ."); *Cain*, 458 So. 2d at 1050 ("[A] water well driller with 23 years of experience would qualify as an expert in the field and should be able to estimate how much it costs to replace

---

[15]In so ruling, the circuit judge added that:

[a] judge has a difficult time separating his own personal beliefs and knowledge from the evidence of a case oftentimes. . . . I, as a . . . property owner, have an opinion myself about the . . . effectiveness of wooden window[s] and . . . I'm familiar with finger-joints. . . . [M]any homes today are still standing with wooden windows – with finger-joints, perhaps my home may be one of those, it was built several years ago.

14

a water well pump or motor."); ***Ford Motor Co. v. Dees***, 223 So. 2d 638, 641 (Miss. 1969) ("part owner and manager of a large automotive repair shop" with thirty years of experience qualified "to testify as an expert on the construction and working of the steering mechanism of a pickup truck and also the manner in which the cab was bolted to the chassis"); ***Ford Motor Co. v. Cockrell***, 211 So. 2d 833, 838 (Miss. 1968) (truck mechanic with thirty-five years of experience and "eight mechanics in his employ" deemed "qualified as an expert witness" in a truck accident case). Here, Birdsong's twenty-four years of experience as a general contractor likely would have qualified him as an expert in the broad field of general contracting. But Birdsong was not offered as an expert in that general field, but rather in the specific field of window manufacture and design, assessing the purported defectiveness of the subject windows. With respect to windows, while Birdsong's experience as a general contractor included installation, repair, and replacement, along with the manufacture of "under a hundred" windows, even he acknowledged that he had no special education, training, or experience specific to windows, and he had never worked for a window manufacturer or seller. Based thereon, this Court finds this case fundamentally distinguishable from those cases in which a witness was qualified as an expert by experience. *See* ***Cain***, 458 So. 2d at 1050; ***Dees***, 223 So. 2d at 641; ***Cockrell***, 211 So. 2d at 838. Furthermore, the limited nature of Birdsong's one-time, exterior observation of the windows in the spring of 2002, *see supra* ¶ 21, calls into question his specific qualifications to testify as either a layperson or expert regarding the defectiveness of those windows. The circuit court determined that Birdsong's lack of experience and/or credentials in the field of window manufacture and design did not sufficiently qualify Birdsong to provide expert testimony.

15

Based on the record before us, we cannot conclude that the learned circuit judge abused his discretion in excluding Birdsong's opinion. *See Kilhullen*, 8 So. 3d at 172. But even assuming *arguendo* that Birdsong was qualified, his testimony lacked both sufficient relevance and reliability.

¶25.     Regarding relevance, Birdsong's testimony was predicated upon his one-time, exterior observation of the windows in the spring of 2002. In that observation, Birdsong did not check for underlying moisture barriers or proper sealing and/or caulking. *See supra* ¶ 21. Therefore, Birdsong can offer evidence only that the windows rotted. But the "fact that is of consequence to the determination of the action" is not that the windows rotted (that fact is not in dispute), but the source of the rot. Miss. R. Evid. 401. This Court fails to see what evidence Birdsong can present that aids that inquiry.

¶26.     As to reliability, Birdsong opined that the windows were defective, as finger-jointed, exterior, wooden windows should be "illegal" in central Mississippi. In formulating this opinion, Birdsong admittedly reviewed no outside sources and could cite no industry standards or building codes in support thereof. In fact, Birdsong acknowledged that thousands of homes in Mississippi have wooden windows.[16] Yet, in Birdsong's own words, his opinion was based upon "my standard" and "Birdsong common sense." As such, this Court summarily concludes that this is nothing more than "unsupported speculation or subjective belief," lacking any semblance of an underlying "reliable principl[e] and

---

[16]Additionally, Stewart, a residential builder involved in the removal of the subject windows, provided deposition testimony that the use of wooden windows is common and that they generally are not defective.

16

metho[d]." ***Hubbard***, 41 So. 3d at 675; Miss. R. Evid. 702. As Weather Shield argues, Birdsong effectively utilized "no methodology, much less a scientifically recognized one[.]" Therefore, even assuming *arguendo* that the circuit court abused its discretion on the qualification issue, which it did not, the application of relevance and reliability principles also would call for the exclusion of Birdsong's expert testimony.

## II. Whether the circuit court erred in granting summary judgment in favor of Weather Shield and Bowers Window.

¶27. "This Court's well-established standard of review for a trial court's grant or denial of summary judgment is *de novo*." ***Covington County Sch. Dist. v. Magee***, 29 So. 3d 1, 3-4 (Miss. 2010) (citations omitted). According to this Court:

> [s]ummary judgment is appropriate where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact[17] and that the moving party is entitled to a judgment as a matter of law." Miss. R. Civ. P. 56(c). "The moving party has the burden of demonstrating that no genuine issue of material fact(s) exists, and the non-moving party must be given the benefit of the doubt concerning the existence of a material fact." [***Waggoner v. Williamson***, 8 So. 3d 147, 152-53 (Miss. 2009)].

***Magee***, 29 So. 3d at 4. However, "[t]he party opposing the motion must be diligent and may not rest upon allegations or denials in the pleadings but must set forth specific facts showing there are indeed genuine issues for trial." ***Williams v. Bennett***, 921 So. 2d 1269, 1272 (Miss. 2006) (citations omitted).

---

[17]"A fact is material if it 'tends to resolve any of the issues properly raised by the parties.'" ***Moss***, 935 So. 2d at 398 (quoting ***Palmer v. Anderson Infirmary Benevolent Ass'n***, 656 So. 2d 790, 794 (Miss. 1995)).

*(A) Weather Shield*

¶28.    When Weather Shield filed a "Motion for Summary Judgment," it maintained that the "*only* claim" against it was "one of 'defective design'." (Emphasis added.)  According to Weather Shield:

> even if there exists evidence of the "failure" of the product, there is no evidence that the product left the control of the manufacturer in a defectively-designed manner, or that the "failure" is anything more than an inherent characteristic of that product – the fact that wood rots.  This is true, particularly where, as here, according to all evidence adduced in discovery . . . , these wooden windows were not properly primed, caulked or flashed at the time they were installed by [Ellington Homes] and/or [its] retained sub-contractors.

Weather Shield further noted that Birdsong, whose expert testimony had been excluded, "was the only witness offered by the [McKees] who would have submitted any evidence that the subject windows were defective and that such defect was the cause of any of the [McKees'] damages."

¶29.    At the motion hearing, the circuit judge asked counsel for the McKees, "how would you ever prove your products liability case without an expert?"  Counsel for the McKees responded that "[t]here's an issue about the composition of that wood and the fact that it rotted in two years as Weather Shield alleged it would if it's completely untreated."[18]

_____

[18]Counsel for the McKees was alluding to a statement of undisputed fact from ***Weather Shield Manufacturing, Inc. v. PPG Industries, Inc.***, 1998 WL 469913 (W.D. Wis. 1998), that "[u]ntreated wood products can fail due to decay within two to ten years depending upon geography, wood species, and other factors." ***Id***. at *1.  But a review of the underlying facts in ***PPG Industries*** reveals it is altogether inapplicable to this case.  There, Weather Shield filed suit against PPG Industries for breach of warranty, negligence, and misrepresentation, alleging that PPG Industries had, beginning in 1984, sold them a "defective wood preservative [PILT] which caused its windows to rot prematurely." ***Id***.  The critical, undisputed fact for purposes of the present case is that, in 1994, Weather Shield

18

According to counsel for the McKees, Weather Shield had not "come forward and indicated with any proof whatsoever that these windows were adequately treated." The circuit court rejected the McKees' argument and entered an "Order Granting Weather Shield Manufacturing, Inc.'s Motion for Summary Judgment."

*(1) Product liability*[19]

¶30. "In 1993, the Mississippi legislature promulgated the Products Liability Act and codified what had formerly been common law strict liability. . . . Since that time products liability claims have been specifically governed by statute . . . ." **Williams**, 921 So. 2d at 1273 (citation omitted). As stated in **Williams**:

> the legislature has codified the requirements unique to a design defect claim and laid out an explicit blueprint for claimants to prove when advancing such a claim. When claimants do not fulfill their statutory obligation, they leave the courts no choice but to dismiss their claims because they fail to offer a key element of proof requisite to the court's determination of whether the claimant has advanced a valid claim under the statute.

---

"discontinued its use of PILT." *Id.* at *2. The subject windows in this case were not ordered until December 1998 and January 1999, and the McKees fail to present any evidence that their windows had been treated with PILT. Accordingly, this Court finds the purported significance of **PPG Industries** to be a "red herring."

[19]On appeal, the McKees additionally contend that Weather Shield breached the implied warranties of merchantability, fitness for a particular purpose, and habitability. But in their initial and amended Complaints, the McKees' lone allegation against Weather Shield was that the windows used in their home were "a defective product in that they have leaked ever since they were placed in the house." As the McKees' implied-warranty claims against Weather Shield are presented for the first time on appeal, this Court concludes that they are *procedurally barred*. *See* **West v. West**, 891 So. 2d 203, 214 (Miss. 2004) (quoting **Crowe v. Smith**, 603 So. 2d 301, 305 (Miss. 1992)) ("In Mississippi, 'an appellant is not entitled to raise a new issue on appeal, since to do so prevents the trial court from having an opportunity to address the alleged error.'"); **Shaw v. Shaw**, 603 So. 2d 287, 292 (Miss. 1992) ("One of the most fundamental and long-established rules of law in Mississippi is that the [appellate court] will not review matters on appeal that were not raised at the trial court level.").

19

*Id*. at 1277.

¶31.  In a product liability suit, "proof of injury alone is insufficient, and . . . more is needed to satisfy the [claimant's] burden." *Forbes v. Gen. Motors Corp.*, 935 So. 2d 869, 880 (Miss. 2006) (citing *Creel v. Gen. Motors Corp.*, 233 So. 2d 105, 109 (Miss. 1970)). *See also Coleman v. Danek Med., Inc.*, 43 F. Supp. 2d 637, 646 (S.D. Miss. 1999) (quoting *Cather v. Catheter Tech. Corp.*, 753 F. Supp. 634, 638-39 (S.D. Miss. 1991)) ("Mere proof of damage following the use of a product is not sufficient to establish liability."). In order for the McKees' design-defect claim to survive Weather Shield's "Motion for Summary Judgment," they must establish that, when the windows left Weather Shield's control, there are genuine issues of material fact regarding whether the windows were (1) "designed in a defective manner;" (2) which rendered them "unreasonably dangerous" to the McKees; (3) that the "defective and unreasonably dangerous condition . . . proximately caused" the McKees' damages; (4) that the damages were not caused by an "inherent characteristic" of the wooden windows which "cannot be eliminated without substantially compromising the product's usefulness or desirability" and which an "ordinary person" would recognize; (5) that Weather Shield knew or should have known of the "danger that caused the damage;" *and* (6) that "there existed a feasible design alternative that would have to a reasonable probability prevented the harm" without also "impairing the utility, usefulness, practicality or desirability of" the windows. Miss. Code Ann. § 11-1-63(a), (b), & (f) (Rev. 2002).

¶32.  Relying upon *PPG Industries*, the McKees contend that "[s]ince the . . . windows rotted within two (2) years, Weather Shield is admitting that it sold what amounted to untreated, unprotected wood that was destined to rot within two years." At a minimum, the

20

McKees assert that there exists a "material issue of fact as to whether the window companies had chosen to palm off on the homeowners the company's old, defective windows that had remained in their inventory from the time [of] the PILT seasoned windows that had failed in innumerable homes . . . ."

¶33.    Weather Shield responds that *PPG Industries* is a "red herring" and that the "sole support" for the McKees' "defective design theory was Bill Birdsong's personal opinion that no one in Mississippi ought to have wooden residential windows."  Weather Shield asserts that this was insufficient to satisfy the McKees' design-defect burden of proof, because Birdsong was "unable to testify as to whether the windows were defective when they left Weather Shield, whether they were defective when they left Bowers [Window], or whether they were defective at all."  Furthermore, Weather Shield maintains that the McKees failed to present evidence "that any alleged defect proximately caused the damage" to their home.  Finally, Weather Shield contends that an "inherent characteristic" of wood is that it rots, and such "cannot be eliminated without substantially compromising the product's usefulness or desirability."

¶34.    This Court finds that the McKees offer only "[m]ere proof of damage following the use of" the Weather Shield windows. *Coleman*, 43 F. Supp. 2d at 646 (quoting *Cather*, 753 F. Supp. at 638-39).  The fact that their windows leaked and rotted is insufficient for this design-defect claim to survive Weather Shield's "Motion for Summary Judgment."  This is particularly true since Birdsong performed only a single, exterior observation of the windows in the spring of 2002, in which he failed to check for underlying moisture barriers or proper sealing and/or caulking; Stewart provided deposition testimony that there was no

21

waterproofing around any of the windows, no moisture barrier above some windows, and "[p]oor framing technique" in the window installation; it is unclear whether the windows were painted within six months of installation, as required to prevent rotting; and the home of the McKees' next-door neighbors, constructed by Ellington Homes, also experienced leaking windows, but did not have Weather Shield windows.[20]

¶35.   Regarding the McKees' argument on the alleged use of improperly treated "PILT seasoned windows," this Court finds an absence of "specific facts showing there are indeed genuine issues for trial." *Williams*, 921 So. 2d at 1272.  A nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts[,]" which the McKees have failed to do.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986).

¶36.   In sum, even giving the McKees "the benefit of the doubt concerning the existence of a material fact[,]" this Court concludes that summary judgment was properly entered in favor of Weather Shield.  *Magee*, 29 So. 3d at 4.

*(B) Bowers Window*

¶37.   In its "Motion for Summary Judgment," Bowers Window maintained that the McKees could not "prove the necessary elements to prove the wooden windows purchased from Bowers [Window] were defective[,]" or "meet their burden of proof with regard to their negligence claims . . . ."  At the motion hearing, counsel for Bowers Window argued that

---

[20]This Court further adds that we have previously affirmed a trial court's finding that "one of the *inherent characteric*[s] of wood is that it rots[,]" and that the McKees offered no evidence of a "feasible design alternative." *Moss*, 935 So. 2d at 405 (emphasis in original); Miss. Code Ann. § 11-1-63(f)(ii) (Rev. 2002).

22

"[w]hen it boils down to it, we sold them some wood windows. [Ann] McKee talked about that she had had wood windows before, and she liked them . . . and . . . that's what it comes down to." In granting Bowers Window's "Motion for Summary Judgment," the circuit judge focused upon Mississippi Code Sections 11-1-63(a)(i)(3) and (f)(i) & (ii), then stated:

> [a]ll of us who are adult owners of . . . frame homes with windows would recognize that the great majority of the homes in this state have wooden windows. The [McKees] should have known that in the location of their home near a lake near the water would be more susceptible to rot and deterioration than a home located somewhere else; yet they chose the site of their home. The [McKees] . . . failed to show a material matter to be developed. . . . *I fail to see how I can be advised of a defective product, and with advice of that defect, turn around and say that I want it anyway, and then later on say I'm entitled to damages because of that defect.*

(Emphasis added.)

### *(1) Product liability*

¶38.     Applying the analysis in *supra* ¶¶ 34-36, as to Bowers Window, and adding that no proof was adduced that Bowers Window "exercised substantial control over . . . the design, testing, manufacture, packaging or labeling of the product that caused the harm[,] . . . altered or modified the product," or "had actual or constructive knowledge of the defective condition of the product at the time [it] supplied the product[,]" this Court concludes that summary judgment was properly entered in favor of Bowers Window on the McKees' product-liability claims. Miss. Code Ann. § 11-1-63(h) (Rev. 2002).

23

*(2) Negligence*[21]

¶39.    The McKees' negligence claim required that they prove, by a preponderance of the evidence, "(1) duty, (2) breach of that duty, (3) nexus, causation or proximate cause, and (4) damages." ***Moss***, 935 So. 2d at 406 (citing ***May v. V.F.W. Post 2539***, 577 So. 2d 372, 375 (Miss. 1991)).

¶40.    According to the McKees, "[f]or these windows to have rotted within a two year time frame, there was negligence involved."  Bowers Window responds that it "did not have anything to do with the actual construction of [the McKees'] house[,]" and  "[t]he mere act of selling windows chosen by the [McKees] is not an act of negligence.[22]  As admitted by [Birdsong], . . . wooden windows were sold throughout Mississippi."  In sum, Bowers Window contends that the McKees "raise lots of questions about the windows but never have presented credible evidence to support their claims or create an issue for a jury."

¶41.    This Court finds that the McKees' negligence claim "fail[s] to present any new discussion or claim that does not relate back to the . . . products liability claim which ha[s] previously been determined to be legally insufficient to survive summary judgment." ***Moss***, 935 So. 2d at 406.  Thus, this Court concludes that summary judgment was properly entered in favor of Bowers Window on the McKees' negligence claim.

---

[21]This Court addresses this claim because it was addressed by Bowers Window. *But see supra* note 9.

[22]According to Bowers Window, the McKees can "cite no support for th[e] general statement" that the seller of windows must have been negligent if the windows rotted within two years.

24

*(3) Warranties*

¶42.    The Mississippi Products Liability Act "does not abrogate a statutory cause of action for breach of implied warranty as grounds for recovery[,]" or, for that matter, any warranty claims. ***Bennett v. Madakasira***, 821 So. 2d 794, 808 (Miss. 2002) (citing Miss. Code Ann. §§ 11-1-63 [(Rev. 2002)], 75-2-715 [(Rev. 2002)]), *abrogated on other grounds by **Hutzel v. City of Jackson***, 33 So. 3d 1116 (Miss. 2010).  Moreover, the implied warranties of merchantability for an ordinary purpose or fitness for a particular purpose may not be contractually waived "in a sale to a consumer . . . of consumer goods . . . ."  Miss. Code Ann. § 11-7-18 (Rev. 2002).  *See also* Miss. Code Ann. § 75-2-719(4) (Rev. 2002) ("[A]ny limitation of remedies which would deprive the buyer of a remedy to which he may be entitled for breach of an implied warranty of merchantability or fitness for a particular purpose shall be prohibited.").  However, "[i]n Mississippi, 'an appellant is not entitled to raise a new issue on appeal, since to do so prevents the trial court from having an opportunity to address the alleged error.'"  ***West***, 891 So. 2d at 214 (quoting ***Crowe***, 603 So. 2d at 305).  *See also **Shaw***, 603 So. 2d at 292 ("One of the most fundamental and long-established rules of law in Mississippi is that the [appellate court] will not review matters on appeal that were not raised at the trial court level.").

¶43.    In this case, the McKees never, over the course of filing three complaints, pleaded claims for breach of implied or express warranty against Bowers Window.  This critical fact fundamentally distinguishes this case from the warranty decisions relied upon by the McKees.  *See **Duett Landforming, Inc. v. Belzoni Tractor Co., Inc.***, 34 So. 3d 603, 605 (Miss. Ct. App. 2009) (suit against manufacturer and seller of tractors for breach of implied

25

warranties of merchantability and fitness for a particular purpose); *Parker v. Thornton*, 596 So. 2d 854, 855-56 (Miss. 1992) (homeowners' suit against building contractor alleging "breach of express and implied warranties of merchantability[,] . . . fitness[,]" and habitability); *North River Homes, Inc. v. Bosarge*, 594 So. 2d 1153, 1158-59 (Miss. 1992) (complaint "alleged that the defendants breached various warranties – express, implied, and fitness[,]" and the trial judge instructed the jury "on the theories of breach of implied warranty of merchantability and fitness . . . ."). On this basis, this Court concludes that the McKees' warranty claims against Bowers Window are *procedurally barred*. *See West*, 891 So. 2d at 214; *Shaw*, 603 So. 2d at 292.

## CONCLUSION

¶44.    Based upon this analysis, this Court affirms the Circuit Court of Madison County's "Order Granting Motion to Exclude Expert Witness Testimony of William Birdsong;" "Order Granting Bowers Window and Door Co., Inc.'s Motion for Summary Judgment;" and "Order Granting Weather Shield Manufacturing, Inc.'s Motion for Summary Judgment."

¶45.    **AFFIRMED.**

**WALLER, C.J., CARLSON AND DICKINSON, P.JJ., LAMAR, KITCHENS, CHANDLER, PIERCE AND KING, JJ., CONCUR.**