CARLTON, J.,
for the Court:
¶ 1. Ralph McKnight & Son Construction Inc. (McKnight) filed a petition to enforce a construction lien on property owned by C & I Entertainment LLC (C & I). C & I subsequently filed a counterclaim against McKnight for breach of contract, breach of the duty of good faith and fair dealing, and negligent construction/breach of workmanship. C & I also sought punitive damages. After a trial in the Attala County Circuit Court, the jury returned a verdict in favor of C & I and awarded $300,845.67 in damages. McKnight now appeals. Finding no error, we affirm.
FACTS
¶2. On August 7, 2001, McKnight entered into a contract with C & I, in which McKnight agreed to construct a movie theater and make certain restorations to an existing skating rink. The total contract price was $483,131.06, plus the bond cost of $6,825.06 and one change order of $5,129, for a total of $495,085.12.
¶ 3. Due to weather problems and C & I’s financing issues, work on the project commenced in May 2002. McKnight began the project by completing renovations on the skating rink, and then proceeded to construct the new movie-theater building. In the fall of 2002, C & I noticed leaks in the roof of the old skating-rink budding and in the new movie-theater building. C & I admitted that upon identifying the leaks to McKnight, McKnight responded *1025 and attempted to repair the leaks. However, C & I claimed that the leaks persisted during construction and even through the date of trial, which commenced nine years later. McKnight responded by arguing that C & I admitted failing to take any action to repair or fix the leaks during this time.
¶4. McKnight substantially completed the movie-theater building in November 2002. The City of Kosciusko inspected the building and approved C & I’s occupation within a few days, subject to McKnight correcting a few “punch list” items. C & I’s lender, Merchants and Farmers Bank, hired building inspector Ken Collins to perform monthly inspections of the work and also to approve applications for payment based on McKnight’s progress in completing the contract tasks. C & I and McKnight both stated at trial that all of McKnight’s applications for payment were approved, except the retainage/last-draw payment of approximately $35,701.51, which C & I withheld pending McKnight’s completion of the punch-list items.
¶ 5. On January 24, 2003, the City of Kosciusko sent a letter to McKnight indicating that two items, the fire caulking for the projection room and the hand rail on the stairs to the projection room, needed to be completed in order to receive a certificate of occupancy. After receipt of the letter, representatives of McKnight and C & I performed a final inspection of the building to address and repair the punch-list items. On January 27, 2003, McKnight sent a letter to C & I outlining these issues as the only outstanding work left to perform. McKnight testified that it had corrected all of the items on the punch list between January 24, 2003, and February 21, 2003.
¶ 6. On February 21, 2003, the City of Kosciusko issued a certificate of occupancy for the theater, and C & I opened the theater on February 23, 2003. On April 24, 2003, McKnight made a warranty call on the project during a rain storm to check the buildings for leaks. Bryan McKnight, the project manager who performed the warranty call, stated that he found no leaks on the premises after an hour of rain.
¶ 7. C & I contends that after notifying McKnight of the leaks in the roof of the old skating-rink building and in the new movie-theater building in fall of 2002, the leaks persisted, despite McKnight’s attempts to repair them. In addition to leaks, C & I identified other faulty-construction issues, such as the failure to comply with building codes. As a result of the outstanding repair work needing to be performed, C & I withheld payment of the retainage money awaiting McKnight’s compliance with the terms of the contract.
¶ 8. McKnight claims that in April 2003, C & I informed McKnight not to come back to the property. C & I disputes this claim. McKnight also alleges that C & I instructed McKnight to refrain from performing any warranty work. However, in its brief, C & I claims that McKnight refused to come back to the property and perform repairs.
¶ 9. Disputes arose between McKnight and C & I regarding the payment of the retainage money and the alleged defects with construction of the project. On June 19, 2003, McKnight filed a construction lien on the property in the principal amount of $37,873.10, which constituted the five percent retainage, plus interest at the contract rate. On August 29, 2003, McKnight filed a petition to enforce the construction lien against C & I. The Attala County Circuit Clerk entered an entry of default on October 16, 2003. After McKnight filed its motion for a default judgment, C & I obtained counsel. McKnight agreed to withdraw the applica *1026 tion for a default judgment and allow C & I to file an answer. On December 18, 2003, the circuit judge entered an agreed order reflecting this agreement. The order also denied the motion for entry of a judgment by default and allowed C & I additional time to file its answer.
¶ 10. On March 2, 2005, C & I filed its answer and also filed a counterclaim against McKnight for breach of contract, breach of duty, and negligent construction/breach of workmanship. C & I also sought punitive damages. After a trial held on March 8-11, 2011, the jury awarded C & I $300,845.67 in damages. McKnight now appeals.
STANDARD OF REVIEW
¶ 11. This Court will not disturb a jury’s verdict “except in the most extreme of situations. Only in those cases where the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice will this Court disturb it on appeal.” Robinson Prop. Grp., Ltd. Partnership v. McCalman, 51 So.3d 946, 948 (¶ 9) (Miss.2011). When reviewing a claim that a judgment is against the overwhelming weight of the evidence, this Court applies the following standard:
In determining whether a jury verdict is against the overwhelming weight of the evidence, this Court will only disturb a verdict which is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice. Reversal is only proper when this Court is convinced that the circuit court has abused its discretion in failing to grant a new trial. Thus, the scope of review on this issue is limited in that all evidence must be construed in the light most favorable to the verdict
Winding v. State, 908 So.2d 163, 167 (¶ 18) (Miss.Ct.App.2005) (citations omitted).
DISCUSSION
I. Whether the jury properly considered C & I’s failure to mitigate damages.
¶ 12. McKnight argues that the jury disregarded testimony and evidence proving that C & I failed in its duty to mitigate damages; thus, the jury erroneously awarded C & I $300,845.67 in damages. McKnight states that testimony elicited by C & I employees at trial establishes that C & I intentionally failed to repair any alleged problems for which C & I sought full damages in the counterclaim, and therefore the jury should have taken into account C & I’s own negligence and culpable conduct in failing to make the necessary repairs.
¶ 13. McKnight also alleges that C & I prohibited McKnight from performing any repair work during the warranty period. In their briefs, both parties state that the contract provided for a one-year warranty after the completion of construction. We acknowledge that the contract provided in the record before us fails to mention any warranty in express terms. The counterclaim by C & I raises not only negligent breach of contract but also breach of the implied duty of workmanship. Clearly, Mississippi law imposes implied warranties relevant to C & I’s counterclaim alleging negligent construction, breach of workmanship, and breach of contract.
¶ 14. When questioned at trial about a warranty period provided in the contract, Emma Ivester, a corporate member of C & I, stated that although she understood that a one-year warranty would be issued, the contract “never had any warranty at all.” This question about the express contract terms, however, over *1027 looks implied warranties existing in Mississippi jurisprudence. In addition to warranties found in express contractual terms, Mississippi also recognizes implied warranties. See Miss.Code Ann. § 15-1^41 (Rev. 2003) (statute of limitations); see also Parker v. Thornton, 596 So.2d 854, 857-58 (Miss.1992). In Parker, the supreme court reiterated “that between the builder-vendor of a new home and his vendee there is an implied warranty that the home was built in a workmanlike manner and [that] it is suitable for habitation.” Parker, 596 So.2d at 857 (citation omitted). The supreme court acknowledged an accompanying “common[-]law duty to perform with care, skill and reasonable experience, and a negligent failure to observe any of these[,] is a tort as well as a breach of contract.” Id.[1] A party must plead its claims for breach of implied or express warranty. See McKee v. Bowers Window & Door Co., 64 So.3d 926, 940-41 (¶ 43) (Miss.2011).[2] Although the record reflects that C & I failed to plead breach of express warranty in its counterclaim, we find that an implied-warranty claim existed in C & I’s claim for negligent construction/breaeh of workmanship.
¶ 15. The record reflects that the jury received instructions on the duty to mitigate and heard sufficient evidence on which to base its decision. Testifying on behalf of C & I, Ivester explained that she notified McKnight about the existence of the leaks, and the need to repair the leaks, on several occasions. Ivester testified that she did not to recall telling McKnight in April 2003 that Ivester did not want McKnight to return and finish any more warranty work. Ivester also denied writing a letter to the same effect, and McKnight produced no such letter at trial.
¶ 16. Tommy McKnight (Tommy), a building contractor for McKnight, testified that he considered the construction to be complete in “January or February” of 2003. Tommy testified that after February 2003, McKnight received a few calls from Ivester regarding repair work on the building. Tommy stated that he performed the requested repairs, but he called Ivester in April 2003 after McKnight had not received payment for the remainder of the work performed. Tommy testified that Ivester told him that she had paid McKnight all that she thought they deserved. Tommy explained that in that same conversation, Ivester informed him that she did not want McKnight to return to the property or to perform any more warranty work. Tommy claimed that he documented this conversation in a letter to Ivester. However, as previously stated, McKnight failed to produce the letter at trial.
¶ 17. With respect to McKnight’s arguments, we recognize that “it is well established that a party has a duty to mitigate its damages.” III. Cent. R.R. Co. v. Winters, 863 So.2d 955, 959 (¶ 6) (Miss.2004); see also Travelers Indent. Co. v. Rawson, 222 So.2d 131, 135 (Miss.1969) (finding it error to refuse a jury instruction that the plaintiffs had a duty to mitigate damages after wind and *1028 rain damaged their home, and they had failed to repair the home for nearly two years). A claimant has “a duty within a reasonable length of time after such original damage to remedy the faulty situation and prevent the subsequent damage.” Rawson, 222 So.2d at 135; see also Hudson v. Farrish Gravel Co., 279 So.2d 630, 634-35 (Miss.1973) (quoting 15 Am.Jur. Damages § 40, at 439 (1938)) (The claimant whose property is injured or threatened possesses the duty “to take reasonable precautions and to make reasonable expenditures to guard against or minimize such injury; and if he fails to do so, he cannot recover damages for any injuries which by the exercise of reasonable care he could have avoided.”).
¶ 18. McKnight cites to Rawson in support of its argument that C & I failed in its duty to mitigate damages. In Rawson, the claimants, the Rawsons, failed to repair the damaged roof on their home for a period of two years, causing further damage to the interior and exterior of their home. Rawson, 222 So.2d at 135. The Mississippi Supreme Court found that the Rawsons possessed a duty to “promptly” mitigate further damages. Id. The supreme court therefore held that the trial court erred in failing to submit the defendant’s requested jury instruction that the Rawsons were not entitled to recover any damages to the residence which would not have been sustained had they promptly remedied or repaired the roof. Id.
¶ 19. McKnight points out that C & I’s own commercial-construction expert, David King, opined at trial that if C & I had performed the necessary repairs on the skating rink and movie theater when C & I first noticed the problems, the repair cost would have been greatly reduced. Regarding the skating rink, King stated that had the problems been fixed within a two-year period following the discovery of the leaks, ninety percent of the damage would not have occurred.
¶ 20. McKnight also cites to the testimony of Scott Gray of Tite Coat International. Gray testified that his company installed the original skating-rink floor in the building. Gray explained that his company returned to the building at some point in 2005 or 2006 to assess water damage that had accumulated as a result of McKnight’s alleged negligence. Gray testified that in his opinion, if C & I had corrected the problems back in 2003 or 2004, the current problems would not have been as extensive.
¶ 21. However, C & I argues that the record supports the jury’s verdict, pointing to Ivester’s testimony that C & I could not afford to fix the leaks and extensive structural repairs due to lack of funds because of the litigation expenses incurred. Precedent establishes an exception to the rule that one has a duty to mitigate his or her damages. The exception applies when the “plaintiff’s lack of funds to meet the situation presented may excuse efforts to lessen the injury.” N. Am. Accident Ins. Co. v. Henderson, 180 Miss. 395, 404, 177 So. 528, 530 (1937) (quoting 17 C.J. § 97, at 771-72).
¶ 22. C & I cites to Tri-State Transit Co. v. Martin, 181 Miss. 388, 396, 179 So. 349, 350 (1938), where the supreme court explained that a standard of reasonableness applies to the duty to mitigate damages:
[Wjhile generally an injured person has the duty to use reasonable care, and to make reasonable effort to prevent or minimize the consequences of the wrong or injury, the rule is one of reason and that, where funds are necessary to meet the situation and the injured person is without funds, he is excused from the effort.
*1029 ¶23. C & I further argues that although its expert, King, testified that less damage to the building would have occurred had C & I completed the repair work earlier, King also opined that the cost of performing such repairs in 2003 would have amounted to nearly $130,000. Although Ivester admitted that C & I failed to take action to permanently repair the leaks in the building over the course of the nine years between the completion of the contract and the date of trial, C & I claims that it indeed took steps to reduce the harm caused by the building defects. Ivester testified that C & I periodically patched holes in the roof of the budding and placed buckets underneath the leaks to prevent damage to the floor. Gray testified that “[Ivester] has done a nice job of trying to protect [the floor] to some degree,” and opined that if Ivester had not protected the floor, the cost of repair would have amounted to double the amount of the current cost of repair to place the floor back in its original condition. Our supreme court has reiterated “the injured party is not precluded from recovery to the extent that he has made reasonable but unsuccessful efforts to avoid loss.” Adams v. U.S. Homecrafters, Inc., 744 So.2d 736, 740 (¶ 12) (Miss.1999) (citing W. Haven Sound Dev. Corp. v. City of W. Haven, 201 Conn. 305, 514 A.2d 734, 748 (1986)).
¶ 24. Additionally, C & I argues that unlike Rawson, the trial court in the present case instructed the jury on the issue of the duty of mitigate damages, as seen in jury instruction 8 submitted to the jury. C & I contends that sufficient evidence existed at trial for the jury to find the actions of C & I reasonable under the circumstances. Robinson Prop. Grp., 51 So.3d at 948 (¶ 9). C & I argues that since such evidentiary support existed to support the jury’s verdict, then in light of our appellate standard of review, we must affirm. We agree.
¶ 25. Applying our standard of review and precedent to the facts of the case at hand, we find that the record supports that a reasonable jury could find that C & I acted reasonably in its efforts to mitigate damages. As asserted by C & I, the record also shows that the circuit judge instructed the jury on the issues of damages and the duty to mitigate. After a review of the record, we find no evidence to support McKnight’s argument that the jury verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice. See id. This issue lacks merit.
II. Whether the trial court erred in allowing King to testify as an expert witness.
¶ 26. McKnight next argues that the testimony of King, C & I’s commercial construction expert, was neither relevant nor reliable, as required by law. See Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). McKnight alleges that King admitted that he first inspected the skating rink and theater in 2007; thus, he cannot testify as to the conditions of these buildings in April 2003. McKnight claims that since King cannot articulate to the jury the conditions of the buildings as of the date C & I allegedly informed McKnight not to return or perform any additional warranty work in 2003, then King’s entire valuation lacks relevance.
¶ 27. The record shows that after considering McKnight’s motion to strike King’s testimony, the circuit court allowed King to testify as an expert in commercial construction. The circuit judge expressed his satisfaction that through King’s work experience and training, he had acquired knowledge in the area of construction that *1030 the average layman would not possess. McKnight disputes this finding, arguing that King failed to produce any documentation, certificate, or other tangible proof of his claimed credentials as a licensed building-construction contractor with the State of Mississippi’s Board of Contractors.
¶28. Our supreme court has established that the admission of expert testimony lies within the sound discretion of the trial court. Miss. Transp. Comm’n v. McLemore, 863 So.2d 31, 34 (¶ 4) (Miss.2003); Extension of Boundaries of Tupelo v. City of Tupelo, 94 So.3d 256 (Miss.2012). Mississippi Rule of Evidence 702 provides factors which must be satisfied in order for expert testimony to be admissible:
If scientific, technical or other specialized knowledge will assist the trier of fact to understand or determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.
¶ 29. In McLemore, the Mississippi Supreme Court adopted the modified Daubert[3] standard for determining the admissibility of expert testimony, explaining:
[T]he analytical framework provided by the modified Daubert standard requires the trial court to perform a two-pronged inquiry in determining whether expert testimony is admissible under Rule 702. The modified Daubert rule is not limited to scientific expert testimony — rather, the rule applies equally to all types of expert testimony. First, the court must determine that the expert testimony is relevant — that is, the requirement that the testimony must “assist the trier of fact” means the evidence must be relevant. Next, the trial court must determine whether the proffered testimony is reliable. Depending on the circumstances of the particular case, many factors may be relevant in determining reliability, and the Daubert analysis is a flexible one. Daubert provides “an illustrative, but not an exhaustive, list of factors” that trial courts may use in assessing the reliability of expert testimony.
McLemore, 863 So.2d at 38 (¶ 16) (internal citations and quotations omitted).
¶ 30. Stated otherwise, our supreme court precedent establishes that an expert witness must be qualified to render the opinion, and the expert testimony must also be both relevant and reliable. Watts v. Radiator Specialty Co., 990 So.2d 143, 146 (¶ 7) (Miss.2008) (citing McLemore, 863 So.2d at 35 (¶ 7)). See also Rebelwood Apartments RP, LP v. English, 48 So.3d 483, 494 (¶ 51) (Miss.2010) (“expert’s qualification and reliability of testimony are separate questions”).
¶ 31. In Bailey Lumber & Supply Co. v. Robinson, 98 So.3d 986, 994-95 (¶ 23) (Miss.2012), the supreme court explained that party offering expert testimony “must show that the expert has based his testimony on the methods and procedures of science, not merely his subjective beliefs or unsupported speculation.” The supreme court again recognized its adoption of the Daubert standard for determining reliability, stating:
*1031 The Court in Daubert adopted a non-exhaustive, illustrative list of reliability factors for determining the admissibility of expert witness testimony. The focus of this analysis must be solely on principles and methodology, not on the conclusions [that] they generate. These factors include whether the theory or technique can be and has been tested; whether it has been subjected to peer review and publication; whether, in respect to a particular technique, there is a high known or potential rate of error; whether there are standards controlling the technique’s operation; and whether the theory or technique enjoys general acceptance within a relevant scientific community.
Id. (quoting McLemore, 863 So.2d at 36-37 (¶ 13)) (internal citations and quotations omitted). Further stated, expert testimony must be relevant and based on fact. See Treasure Bay Corp. v. Ricard, 967 So.2d 1235, 1242 (¶29) (Miss.2007) (finding testimony “not based upon the facts [was] therefore unreliable”); Tunica County v. Matthews, 926 So.2d 209, 213-14 (Miss.2006); APAC-Miss., Inc. v. Goodman, 803 So.2d 1177, 1185 (¶30) (Miss.2002) (‘“The facts upon which the expert bases his opinion must permit reasonably accurate conclusions as distinguished from mere guess or conjecture.’ ”) (citation omitted).
¶ 32. In McKee, 64 So.3d at 932 (¶ 18), our supreme court addressed reliability of expert testimony, recognizing that as to relevance, Mississippi Rule of Evidence 401 “favors admission of the evidence if it has any probative value,” and “[t]he threshold for admissibility of relevant evidence is not great.” See also Investor Res. Servs., Inc. v. Cato, 15 So.3d 412, 417 (¶ 6) (Miss.2009) (quoting McLemore, 863 So.2d at 40 (¶27)). We note that although the threshold for relevance is low, the trial court must also “examine the reliability” of the expert’s opinion in its gatekeeping role. Janssen Pharmaceutica, Inc. v. Bailey, 878 So.2d 31, 60 (¶ 135) (Miss.2004) (citations omitted). The supreme court further has explained that:
In evaluating reliability, the court’s ‘focus must be solely on principles and methodology, not on the conclusions that they generate.’ Daubert, 509 U.S. at 595, 113 S.Ct. 2786. Expert testimony admitted at trial must be based on scientific methods and procedures, not on unsupported speculation or subjective belief.” Hubbard v. McDonald’s Corp., 41 So.3d 670, 675 [ (¶ 16) ] (Miss.2010)[.] See also Gulf [S.] Pipeline[] Co. v. Pitre, 35 So.3d 494, 499 [ (¶ 8) ] (Miss.2010) (“Merely speculative expert opinions should not be admitted.”); Edmonds v. State, 955 So.2d 787, 792 [ (¶ 8) ] (Miss.2007) (“A court should not give an expert carte blanche to proffer any opinion he chooses.”); McLemore, 863 So.2d at 37 [ (¶ 13) ] (quoting Kumho Tire [Co., Ltd. v. Carmichael], 526 U.S. [137,] 157, 119 S.Ct. 1167, 143 L.Ed.2d 238 [ (1999) ]) (“Neither Daubert nor the Federal Rules of Evidence requires that a court ‘admit opinion evidence that is connected to existing data only by the ipse dixit of the expert,’ as self-proclaimed accuracy by an expert is an insufficient measure of reliability.”).
McKee, 64 So.3d at 932-33 (¶ 18).
¶ 33. We must now determine whether the admission of the expert testimony in this case rose to the level of an abuse of judicial discretion. See Rebelwood Apartments, 48 So.3d at 494 (¶ 48).
¶ 34. After reviewing the record, we note that at trial, McKnight failed to object to King’s testimony based on *1032 relevance.[4] The failure to raise an issue at trial creates a procedural bar that prohibits review of the issue on appeal. Glasper v. State, 914 So.2d 708, 721 (¶ 30) (Miss.2005); see also Oates v. State, 421 So.2d 1025, 1030 (Miss.1982) (“Objections to the admissibility of evidence must specifically state the grounds[;] otherwise, the objection is waived.”). Procedural bar notwithstanding, Mississippi Rule of Evidence 703, governing the bases of opinion testimony by experts, provides:
The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.
Upon review with an abuse-of-discretion standard, we find that the record reflects both parties presented documents prior to trial providing ample facts regarding the condition of the buildings in 2003. Therefore, the trial court did not abuse its discretion in finding King had a sufficient basis for a reliable opinion.[5]
¶ 35. Addressing McKnight’s allegation that King lacks the requisite qualifications to be an expert witness, C & I submits that King began working in the construction business in 1965 and that through his business, King Metal Buildings Inc., he gained experience with building the type of buildings at issue in the present case. During voir dire, King testified that he has built numerous commercial buildings, many the size of the theater at issue here and some even larger. King also confirmed that “there is not a component of the interior of the [theater building] that [King has not] had experience building multiple times.”
¶ 36. Despite King’s failure to provide proof that he had a Mississippi license to perform work as a general building-construction contractor or concrete contractor, Mississippi jurisprudence has allowed nonlicensed experts to provide relevant expert testimony when they possess specialized knowledge, training, and expertise in that area. In Kilhullen v. Kansas City Southern Railway, 8 So.3d 168, 172-74 (¶¶ 10-11) (Miss.2009), the Mississippi Supreme Court addressed an experts witness’s lack of certification and determined that the expert indeed possessed the requisite “professional qualifications” to give his expert opinion. The supreme court held:
In rejecting [the expert’s] affidavit due to his lack of “specialized knowledge, training or expertise in the field of accident reconstruction,” this Court finds that the circuit court abused its discretion. Given his applied engineering expertise, classification as an accident re-constructionist was not necessary, see [University of Mississippi Medical Center v.] Pounders, 970 So.2d [141,] 146 [(¶ 17) (Miss.2007)]; Sacks [v. Necaise], 991 So.2d [615,] 622 [(¶¶ 22-23) (Miss.Ct.App.2007) ], and this Court concludes that [the expert’s] affidavit satisfied Mississippi Rule of Evidence 702.
Id. Additionally, in University of Mississippi Medical Center v. Pounders, 970 So.2d 141, 146 (¶ 17) (Miss.2007), the supreme court clarified that “a witness need not be a specialist in any particular profes *1033 sion to testify as an expert. The scope of the witness’s knowledge and experience, and not any artificial classification, governs the question of admissibility.” (Citations omitted).
¶ 37. Applying precedent to the facts before us, we find no abuse of discretion in the circuit court’s admission of King’s expert testimony, since the record provides support for such determination. The record reflects evidence supporting the circuit court’s finding that King possessed sufficient qualifications and expertise in the area of commercial construction to support his expert opinion.
III. Whether the jury wrongfully assessed damages against McKnight.
¶ 38. McKnight’s final assignment of error alleges that the jury wrongfully assessed damages for items that were not part of the contract between McKnight and C & I. McKnight specifically points to the jury’s award to C & I of $3,275 for the installation of a fire exit door; $3,134 for the cost of double doors; $1,352.83 for rails for an exit ramp; and $4,100 for the installation of the exit ramp, totaling $11,861.83. McKnight claims that the contract between it and C & I failed to provide for these specific expenses and installations; therefore, McKnight should not be required to remit damages for these items.
¶ 39. C & I responds that the evidence presented at trial supported the jury’s award of damages. C & I raises no dispute that the specifications in the building did not mention every material or task necessary to bring the buildings within code requirements. However, C & I claims that the contract specifications indeed state that the metal budding must comply with “standard building code.” C & I submits that this provision constitutes an agreement that the work performed by McKnight would comply with all applicable fire and building codes.
¶ 40. McKnight failed to provide any authority supporting his argument for this issue. This Court acknowledges that the law is well established in Mississippi that this Court is not required to address any issue unsupported by reasons and authority. Hoops v. State, 681 So.2d 521, 535 (Miss.1996) (citation omitted); see also M.R.A.P. 28(a)(6).
¶ 41. Procedural bar notwithstanding, we recognize that although McKnight disputes the amount of damages awarded for four specific items, the jury-verdict form awarding damages reflects that the jury did not itemize each item of damages, but rather returned a general verdict in favor of C & I in the amount of $300,845.67. Both parties submitted documents outlining the construction costs of the building as well as the projected costs of repair. Both parties also presented testimony from witnesses and experts opining as to the costs of building and repair work. We also acknowledge that Chief Duane Burdine, the fire chief for the City of Kosciusko, testified regarding the City’s code guidelines and regulations for metal buildings. When questioned at trial, Tommy McKnight admitted that contractors are responsible for constructing buildings that meet code regulations. Tommy countered this admission by warning that “if the owner eliminates or don’t [sic] do something, that’s the owner’s responsibility.”
¶ 42. As previously noted, the record shows that the circuit judge instructed the jury on damages. The determination of damages falls within the province of the jury, and not this Court. Sharp v. Odom, 743 So.2d 425, 431 (¶ 11) (Miss.Ct.App.1999). Additionally, “[i]t is primarily the province of the jury to deter *1034 mine the amount of damages to be awarded!;,] and the award will normally not ‘be set aside unless so unreasonable in amount as to strike mankind at first blush as being beyond all measure, unreasonable in amount and outrageous.’ ” Harvey v. Wall, 649 So.2d 184, 187 (Miss.1995) (citing Rodgers v. Pascagoula Pub. Sch. Dist., 611 So.2d 942, 945 (Miss.1992)). After reviewing the evidence here, we cannot find that the jury’s award of damages “is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice”; therefore, we affirm. See Robinson Prop. Grp., 51 So.3d at 948 (¶ 9).
¶ 43. THE JUDGMENT OF THE AT-TALA COUNTY CIRCUIT COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., ISHEE, ROBERTS, MAXWELL, RUSSELL AND FAIR, JJ., CONCUR. BARNES, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.

. See also George B. Gilmore Co. v. Garrett, 582 So.2d 387, 395 (Miss.1991) (holding that implied in every building contract is the notion that the work shall be performed in a skillful, careful, diligent, workmanlike manner); May v. Ralph L. Dickerson Constr. Corp., 560 So.2d 729, 730-31 (Miss.1990) (citing Mississippi Code Annotated section 11-7-20 (Rev.2004) and recognizing implied warranties of workmanship and habitability in suit for negligent construction).

. The supreme court in McKee held that the plaintiffs' warranty claims against the defendants were procedurally barred due to the plaintiffs' failure to plead claims for breach of implied or express warranty.

. Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579. 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

. The record shows that when the circuit judge heard arguments on the motion in li-mine to strike King as an expert, McKnight explained that it based its objection on King’s lack of a license.

. See Janssen Pharmaceutica, 878 So.2d at 60 (¶ 135) (citations omitted).