ISHEE, J.,
for the Court:
¶ 1. Bobby Lott sustained an eye injury while working at Corinthian Inc. in January 2010. He was later terminated by Corinthian for failing to follow the proper procedures for reporting a work-related injury. Shortly thereafter, he filed a workers’ compensation claim against Corinthian alleging that he was terminated in bad faith and that all Appellees failed to conduct a good-faith investigation into his claim. The Appellees continued their investigation, and Lott was seen by several doctors over the next few months. Ultimately, Corinthian paid workers’ compensation benefits due from the date of injury until Lott was released back to work. An administrative judge (AJ) with the Mississippi Workers’ Compensation Commission determined that the benefits paid were sufficient and that Lott’s termination was not executed in bad faith, nor was the investigation conducted in bad faith. Lott later filed suit in the Prentiss County Circuit Court alleging wrongful termination, gross negligence, and intentional and. willful infliction of emotional distress. The Appellees filed motions for summary judgment, which were granted. Aggrieved, Lott appeals. Finding no error, we affirm.
STATEMENT OF FACTS
It 2. On January 18, 2010, Lott was employed by Corinthian as an at-will employee in the upholstery department. Specifically, Lott was working with upholstered ottomans assembling the legs onto the ottomans. On that day, Lott claims that one of the legs ricocheted and hit him in his right eye while he was attempting to secure the leg into the furniture. Lott immediately asked two nearby coworkers if his eye was injured. Lott claims that he also advised Tracy Wren of the injury shortly thereafter. Lott maintains that Wren is his “lead supervisor,” while Corinthian identifies her as a “floater on the production line.” Lott claims that he had been told by Michael Lambert, supervisor over the upholstery department at Corinthian, to report any incident or injury to *1026 Wren. Corinthian and Lambert deny this fact. Regardless, when asked on forms to list his supervisor, Lott repeatedly listed Lambert.
¶ 3. In Corinthian’s employee handbook, it advised its workers that they were to report all injuries to their supervisor on the day an incident occurred. Failure to do so is listed in the handbook as a ground for termination. The handbook also states that by clocking out, an employee certifies that he has reported any injuries to his supervisor. Lott signed the handbook on his first day of work in 2008, and in doing so he acknowledged that he had read and agreed to all of the terms in the handbook.
¶ 4. Lott worked the remainder of his shift on the day of the injury and clocked out, and he worked the entirety of his shift the next day, also clocking in and out. On January 20, 2010, Lott claims he awakened with pain and loss of sight in his right eye. Lott again reported his injury to Wren, who sent Lott to speak with Lambert. Lambert advised Lott to meet with Marsha McCollum, a Cannon Cochran Management Services employee. Cannon was under contract with Mississippi Manufacturers Association Workers’ Compensation Group (MMA) to serve as the third-party-claims administrator for MMA’s members, including Corinthian.
¶ 5. On January 20, 2010, after speaking with Lott, McCollum made arrangements for Lott to see two eye specialists— Dr. Craig Cleveland and Dr. Tawan S. Khamapirad. McCollum accompanied Lott to the doctor appointments. While in the appointments, she discovered that Lott had previously had cataract surgery on his left eye in 2006 and had been advised to have the same surgery on his right eye in 2007, but he had declined to undergo the surgery. During the appointments, Lott advised the doctors that he had not had any trouble with his right eye since 2007 and had been able to work and live normally until the incident at hand.
¶ 6. Lott was diagnosed with traumatic cataract, traumatic iritis, and a vitreal bleed to his right eye. He was advised that he needed surgery on the eye as soon as the inflammation subsided. A follow-up appointment was scheduled with Dr. Kha-mapirad for January 25, 2010. After the follow-up appointment, Dr. Khamapirad restricted Lott’s work duties to desk work until the surgery could be performed on his injured eye.
¶ 7. The summary of Dr. Khamapirad’s assessment, including his recommendation for surgery and his restriction of Lott’s work duties, was received by Corinthian on January 27, 2010. The next day, Lott was terminated by Corinthian. Corinthian states that it fired Lott because he failed to follow the proper procedure for reporting a work-related injury. Lott claims that he was wrongfully terminated since he had, in fact, reported the injury to Wren. Lott also argues that the firing was done in bad faith because Corinthian could have fired him the day the injury was reported but, instead, waited over a week later until surgery and work restrictions had been recommended to terminate his employment.
¶8. Prior to Lott’s termination, between January 25 and January 27, 2010, McCollum investigated Lott’s claim. She spoke with the coworkers whom Lott had asked about the condition of his eye following the incident. She gathered Lott’s hours and work schedule to calculate his time off of work. She also accumulated a record of his wages for the prior year for wage-earning-capacity calculations. She sent all of this information to Cannon with her opinion attached. She stated that Lott’s claim was “somewhat questionable” in part due to his preexisting cataract condition in the injured eye. Lott claims that *1027 McCollum was -wrong both in terminating him and in contesting his unemployment benefits after his termination.
¶ 9. On February 1, 2010, Lott retained a lawyer and filed a workers’ compensation claim, even though Corinthian had not yet denied any benefits to Lott. However, in a letter dated February 8, 2010, MMA’s attorney stated that Lott’s injuries predated any alleged work injury, that there were no eyewitnesses to the actual incident, and that the investigation results did not support Lott’s allegations. The letter went on to state that because of the aforementioned factors, no further benefits would be provided to Lott. Lott asserts that all parties involved breached their duty to properly investigate the incident before discontinuing benefits.
¶ 10. Conversely, Corinthian, Cochran, and MMA claim that they attempted to promptly investigate the claim but were prejudiced in their ability to do so because Lott refused to sign a medical-release authorization until March 2010, despite the authorization being requested at the beginning of February 2010. After receiving the authorization, the Appellees effectually rescinded their letter denying benefits and continued with their investigation. Nonetheless, the Appellees note that Lott’s refusal to execute and return the authorization delayed the investigation by an entire month, thereby also delaying Lott’s receipt of benefits.
¶ 11. On March 8, 2010, Corinthian received Lott’s authorization. Lott’s prior medical records were then obtained and reviewed by Corinthian and Dr. Khamapi-rad. On April 6, 2010, Dr. Khamapirad provided Corinthian with his opinion that the incident on January 18, 2010, “most likely ... exacerbated a pre-existing condition.” On April 19, 2010, Lott received his first temporary total disability (TTD) benefit check covering the time period from April 19, 2010, through May 2, 2010. Retroactive benefit checks were also issued to cover the time from the date of injury, January 18, 2010, through April 19, 2010.
¶ 12. Nonetheless, Lott maintains that Corinthian’s alleged failure to properly investigate his claim and failure to pay the benefits promptly caused him excessive and unnecessary pain and suffering since he was unable to afford to pay for the recommended surgery until the benefit checks were paid. Lott ultimately underwent surgery to his injured eye in May 2010. He was released by his physicians to return to work fully, without restrictions, on July 28, 2010.
¶ 13. After a hearing on the matter before an AJ, summary judgment was granted in favor of the Appellees. The AJ determined that Lott was entitled to TTD benefits from January 20 through June 27, 2010, along with statutory penalties and interest for the delay in payments. Corinthian paid all costs, including an additional four weeks of TTD, to cover June 27 through July 28, 2010—a voluntary extra payment of $939.20. The AJ also concluded that while the claim was initially denied, none of the Appellees had acted in bad faith, but rather, were further investigating the claim in a good-faith manner until it was determined to be compensable.
¶ 14. Displeased with the AJ’s determination, Lott filed a suit in the circuit court against the Appellees alleging wrongful termination, gross negligence, and intentional and willful infliction of emotional distress. The Appellees filed motions for summary judgment, which were granted by the circuit court.
DISCUSSION
¶ 15. The Mississippi Supreme Court has held that an appellate court *1028 “reviews a trial court’s grant or denial of a motion for summary judgment or a motion to dismiss under a [de novo] standard.” Copiah Cnty. v. Oliver, 51 So.3d 205, 207 (¶ 7) (Miss.2011) (citation omitted). Summary judgment is proper “if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.” Palmer v. Anderson Infirmary Benevolent Ass’n, 656 So.2d 790, 794 (Miss.1995) (quoting M.R.C.P. 56(c)). Although this Court must view the evidence in the light most favorable to the nonmoving party, the party opposing the motion “may not rest upon the mere allegations or denials of his pleadings, but his response ... must set forth specific facts showing that there is a genuine issue for trial.” M.R.C.P. 56(e). “[W]hen a party[ ] opposing summary judgment on a claim or defense ... fails to make a showing sufficient to establish an essential element of the claim or defense, then all other facts are immaterial, and the moving party is entitled to judgment as a matter of law.” Galloway v. Travelers Ins. Co., 515 So.2d 678, 684 (Miss.1987).
¶ 16. Lott’s assignments of error are general challenges to the circuit court’s grant of the Appellees’ motions for summary judgment, which dismissed Lott’s claims of wrongful termination, gross negligence, and intentional and willful infliction of emotional distress. We begin with the issue of wrongful termination. While Lott mentions in passing that he was wrongfully terminated, the issue itself is never discussed, much less argued with authority, by Lott on appeal. The Mississippi Rules of Appellate Procedure require that the brief of an appellant “contain the contentions of [the] appellant with respect to the issues presented, and the reasons for those contentions, with citations to the authorities, statutes, and parts of the record relied on.” M.R.A.P. 28(a)(6). It is well settled that “this Court is not required to address any issue unsupported by reasons and authority.” R. McKnight & Son v. C & I Entm’t, 100 So.3d 1022, 1033 (¶ 40) (Miss.Ct.App.2012) (citing Hoops v. State, 681 So.2d 521, 535 (Miss.1996); M.R.A.P. 28(a)(6)).
¶ 17. Though Lott failed to properly address his argument regarding wrongful termination, our review of the issue shows that Lott’s challenge is without merit. It is undisputed that Lott was an at-will employee of Corinthian. It is also undisputed that he was aware of and consented to the policies contained within Corinthian’s employee handbook. One of the policies dictated that Lott inform his supervisor of any injury occurring at work on the day the injury occurred. The record reflects that when asked on numerous forms to list his supervisor, Lott listed Lambert, not Wren. Likewise, Corinthian lists Wren as merely a “floater,” and Lambert as the “upholstery department supervisor.” Failure of an employee to inform his supervisor of an injury on the day the injury occurs is listed as a ground for immediate termination. Additionally, Corinthian’s handbook dictates that by clocking out, an employee verifies that his supervisor has been notified of any and all injuries to the employee. It is undisputed that Lott clocked in and out of work the day the injury occurred and the following day before informing Lambert of the injury.
¶ 18. The supreme court has long held that “[a]n at-will employment contract may be terminated at any time, by either party to the contract.” Jones v. Fluor Daniel Servs. Corp., 959 So.2d 1044, 1046 (¶ 10) (Miss.2007). Lott was aware of Corinthian’s policies regarding reports of injury. *1029 He acknowledged in written form on numerous occasions that Lambert, not Wren, was his supervisor. As such, we find that Lott’s termination was not wrongful. This issue is without merit.
¶ 19. We next address Lott’s claim that the Appellees acted with gross negligence in delaying payment of his benefits. Lott filed his petition to controvert less than two weeks after his injury and prior to any denial of benefits. While Lott does not contend that his benefits should have been paid prior to the filing of his claim, he asserts that the Appellees delayed the payment of his benefits after he filed the claim by conducting an investigation in bad faith.
¶20. This Court has specifically addressed the issue of bad-faith denial of payment in Pilate v. American Federated, Insurance Co., 865 So.2d 387 (Miss.Ct.App.2004). Therein, we stated:
[I]f the insurer had a legitimate or arguable reason for not paying a claim, the insurer is deemed to have acted in good faith. On the other hand, if the insurer did not have a legitimate or arguable basis for not paying the claim and acted with willful, malicious, gross negligence, or reckless disregard for the rights of the claimant, then punitive damages will lie.
Id. at 391 (¶ 24). We went on to note:
Obviously, some delay in evaluating claims is inevitable, legitimate[,] and socially useful. Insurers are entitled, and in fact legally obligated, to investigate fully the legitimacy of claims, and some skepticism in evaluating claims is appropriate. Since an insurer has an obligation under Mississippi law to investigate claims, discharging that duty is not bad faith. However, an inadequate investigation of a claim may create a jury question on the issue of bad faith.
Id. at 394 (¶ 35) (citation omitted),
¶ 21. Here, the Appellees claim that Lott’s failure to provide them with a medical-release authorization significantly hindered their ability to investigate the claim promptly. Indeed, the record is clear that Lott refused to execute and return the medical-release affidavit until a month after it was requested by the Appel-lees. It is without question that in order to conduct a good-faith investigation into a claim, an insurer must “obtain all available medical information relevant to the policyholder’s claim and interview all employees or individuals who have knowledge relevant to the claim.” Id. Hence, failure of the Appellees to have a medical-release authorization is a valid explanation for at least one month of delay in investigating the claim.
¶22. Nonetheless, after receiving the authorization, Lott’s benefits were paid within a reasonable time frame. Specifically, the timeline of events consisted of the following: Lott’s injury occurred in January 2010, with surgery and restrictions recommended at the end of January; the Appellees requested the medical-release authorization in February; Lott executed and returned the authorization in March; Appellees requested and received an independent medical examination (IME) report in April, and Appellees issued Lott’s first benefit check at the end of April. Accordingly, it was little more than a month between the time the Appel-lees received the authorization and the issuance of the first benefit check. During that month, the record indicates that Ap-pellees gathered medical information, spoke with Lott’s medical providers, and requested and awaited receipt of the IME report. We find these actions and the time frame for the actions to be a reasonable course of investigation. Hence, we cannot conclude that the Appellees’ actions in investigating the claim rose to the level of gross negligence. This issue is merit-less.
*1030 ¶ 23. Finally, Lott asserts that the Ap-pellees committed intentional and -willful infliction of emotional distress in terminating him. Having previously determined that Lott’s termination was lawful, we And this issue to be moot.
¶ 24. THE JUDGMENT OF THE PRENTISS COUNTY CIRCUIT COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ROBERTS, CARLTON, MAXWELL AND FAIR, JJ., CONCUR. JAMES, J., CONCURS IN PART WITHOUT SEPARATE WRITTEN OPINION.